No. 2--04--1281                                        filed: 1/11/07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 03--CF--609 |
| BENJAMIN D. BRADY, | ) ) | Honorable John R. Truitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KAPALA delivered the opinion of the court:

A Winnebago County jury found defendant, Benjamin D. Brady, guilty of drag racing (625 ILCS 5/11--504 (West 2002)) and leaving the scene of a motor vehicle accident involving the death of a person (625 ILCS 5/11--401(b) (West 2002)).  Thereafter, the trial court sentenced defendant to a term of conditional discharge.  Defendant appeals, contending that: (1) the State failed to prove beyond a reasonable doubt that he violated section 11--401 of the Illinois Vehicle Code (625 ILCS 5/11--401 (West 2002)); (2) section 11--401 is unconstitutionally vague as applied to his conduct; and (3) as applied to his conduct,  section 11--401 violated his constitutional privilege against self-incrimination.  We reject each of defendant's appellate contentions and, consequently, affirm the judgment of the circuit court of Winnebago County.

## I. FACTS

Defendant was charged by indictment with leaving the scene of a motor vehicle accident involving the death of a person, aggravated reckless driving (625 ILCS 5/11--503(c) (West 2002)), and drag racing. The accident at issue occurred on February 25, 2003, at approximately 4 p.m. on East State Street in Rockford, Illinois. Twenty-two-year-old Jason Rush was driving a black Ford Mustang Cobra and died as a result of injuries that he sustained in the accident. The wreckage was located near the intersection of East State Street and Mid America Drive. At the location of the accident, East State Street has three lanes for eastbound traffic and three lanes for westbound traffic. The posted speed limit at the location of the accident was 45 miles per hour.

At trial, Tammy Rezin testified that she was driving east on East State Street in the afternoon on February 25, 2003. Rezin stopped in the right lane at a red light at the intersection of East State Street and Bienterra Trail. Rezin noticed a teal blue car next to her car. Rezin heard some engine revving as the light turned green, and the blue car and a black car to the left of the blue car started going very fast. The cars proceeded "pretty much right next to each other" until the black car tried to switch into the middle lane to get in front of the blue car. The black car attempted to change lanes so fast that it rolled out of control. Rezin did not see the black car come in contact with the blue car, but "it had to have been by a hair that it missed it." Rezin stopped her car and so did the driver of the blue car, whom Rezin identified as defendant. The driver of the black car had been thrown from his vehicle and was lying in a ditch. Upset, Rezin said to defendant, "you were racing." In response, defendant said, "we couldn't have been going more than 50 miles an hour." Referring to the driver lying in the ditch, Rezin told defendant, "that could have been you." Defendant did not respond. Before defendant drove off, Rezin said "somebody get [his] license plate."

Tracy Hoffman testified that she was working at the KDA kitchen and bath store on East State Street on February 25, 2003. At approximately 4 p.m., Hoffman stepped outside to have a cigarette, heard a loud noise, and saw a black car flying through the air. The car's door came off and a body flew from the car and landed in the ditch. The black car landed on Mid America Drive. Hoffman yelled to her coworkers to call 911 and then ran to the ditch, where she saw a body. When Hoffman turned around, she saw a blue Camaro on Mid America Drive. When Hoffman asked where the other car was, a man Hoffman identified as defendant said "there was no other car." A woman came up to defendant and began yelling at him, accusing him of racing. At first defendant denied the accusation and then said, "but we weren't going that fast." Next, Hoffman noticed that the blue Camaro and defendant were gone.

Kristopher Bauch testified that he was driving east in the far-right lane of East State Street on February 25, 2003. On his left, Bauch observed a blue Camaro and a black Mustang Cobra "scream" past his truck with their motors "revving pretty high." Bauch thought that they were "drag racing or whatever." As the vehicles passed his truck, they were right next to each other and, Bauch estimated, they were traveling between 60 and 100 miles per hour. A white Chevrolet Cavalier emerged from an access road and traveled east in the far-right lane. The white Cavalier moved into the lane in which the black Mustang traveled. The black Mustang had to slam on the brakes to avoid hitting the white Cavalier. As a result, the driver of the black Mustang lost control, slid sideways, hit the curb, did a few barrel rolls, hit the ditch, and started to roll end-over-end. Car parts flew everywhere and the black Mustang landed on an access road. Bauch stopped his vehicle, and the blue Camaro, the white Cavalier, and another car also stopped. Bauch saw defendant get out of the blue Camaro. When the police arrived, the blue Camaro and defendant were gone.

Traffic accident reconstructionist Charles E. Carlson of the Rockford police department estimated that the minimum speed of the black Mustang Cobra was between 81 and 88 miles per hour before it started skidding. Based on the skid marks in the center lane attributed to the blue Camaro, Carlson estimated the vehicle's minimum speed at 60 miles per hour at the beginning of the skid. From the position of the skid marks, it appeared to Carlson that the black Mustang was to the left of the blue Camaro and then crossed in front of the Camaro. Carlson found no evidence to indicate that the black Mustang or the blue Camaro hit any other vehicle. Carlson agreed that Jason Rush being thrown from the vehicle indicated that he was not wearing a seatbelt.

Other evidence presented by the State established that 18 telephone calls came into the 911 Center on February 25, 2003, between 4:01 and 4:09 p.m. One of those calls was from defendant's cellular telephone. No member of the Rockford police department acquired from defendant within one hour of the accident the information required by section 11--401(b). In fact, from the time of the accident on February 25, 2003, through February 28, 2003, the date defendant was arrested, defendant did not give any information to the police regarding the accident. Jody Gaunt was the driver of the white Cavalier. An investigator with the Rockford police department characterized Gaunt as a witness who was not involved in the accident. A medical examiner determined that Jason Rush died from neurogenic shock due to acute cranio-cerebral blunt trauma resulting from a motor vehicle crash.

In his motion for a directed verdict at the close of the State's case, defendant argued, among other things, that the State failed to produce evidence that he was "involved in a motor vehicle accident." The trial court denied defendant's motion.

The 21-year-old defendant[1] testified that since 2002 he and his father have jointly owned a blue 1991 Chevrolet Camaro. Just before 4 p.m. on February 25, 2003, defendant drove his girlfriend to Value City Furniture, which is adjacent to the intersection of North Mulford Road and East State Street. Defendant then headed home to his parents' house on Anee Drive. Defendant explained that his intended route was east on East State Street, then south on Mid America Drive to Anee Drive. Defendant drove his blue Camaro out of the parking lot of Value City Furniture, onto North Mulford Road, and then south a short distance to the traffic light at the intersection of North Mulford Road and East State Street. While waiting to turn left onto East State Street, defendant noticed a black Mustang Cobra directly ahead of him, also waiting to turn left. Defendant said he noticed the black Mustang because it looked "clean," meaning "well taken care of, a nice looking car."

Defendant turned left onto East State Street, passed the black Mustang, and proceeded to a red light at the intersection of East State Street and Bienterra Trail. Defendant said there were no other cars on East State Street between Bienterra Trail and the next traffic light, at Trainer Road. Defendant waited in the middle lane, and the black Mustang stopped directly behind him. Defendant said that he had never seen the black Mustang before and had no idea who was driving the vehicle. According to defendant, "[the driver of the black Mustang] revved his engine at [defendant], or just revved his engine." When the light turned green, defendant "took off kind of fast." About half-way to Trainer Road, defendant looked in his mirror and noticed the black Mustang merge into the left lane and then accelerate past the left side of his vehicle. As the black Mustang "came flying by" him, defendant accelerated. When asked why he accelerated, defendant said "[s]tupid, showing off."

---

[1]Documents in the record indicate that defendant's date of birth is September 26, 1983. Thus, defendant was 19 years of age on the date of the accident.

Defendant said the black Mustang was probably three or four car lengths ahead of him when he hit the gas. Defendant denied racing the black Mustang. Before defendant reached the intersection of East State Street and Trainer Road, a white Cavalier turned right from Trainer Road and headed east on East State Street, in the right lane. Next, the white Cavalier moved into the center lane and then into the left lane. Defendant said the black Mustang almost hit the white Cavalier and passed from left to right in front of his vehicle before losing control and going down into the ditch. According to defendant, the black Mustang passed in front of him and lost control about three or four car lengths ahead of his vehicle. Defendant slowed down, moved into the right lane, and then turned right onto Mid America Drive. Defendant denied locking up his wheels or skidding his tires.

Defendant said he stopped his vehicle and walked over to the hill on the east side of Mid America Drive. Defendant called 911 and learned that the police were already on their way. When someone asked where the other car was, defendant said "there was no other car." Next, a lady came up to defendant and screamed that he and the black Mustang had been racing. Defendant tried to tell the lady that that was not what happened, but she kept screaming at him. Defendant said it "just scared the crap out of [him]," so he left. Before he left, defendant heard a person suggest that someone get his license plate number because "they were racing." Defendant said he was at the accident scene for three to five minutes. Defendant explained that he left before the police arrived, because he was "just petrified from this lady screaming at [him][,] and what [he] saw, it was just horrible." Defendant said he did not believe that he was involved in the accident and did not call the police within one hour of the accident. Defendant agreed that he was probably speeding on East State Street that afternoon. Defendant said it was possible that he was going 60 miles per hour, but not 80 to 100 miles per hour.

The jury found defendant not guilty of aggravated reckless driving but guilty of drag racing and leaving the scene of a motor vehicle accident involving death. After hearing and denying defendant's posttrial motion, the trial court sentenced defendant to a two-year term of conditional discharge. This appeal followed.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Defendant contends that the State failed to prove beyond a reasonable doubt that he was "involved in a motor vehicle accident," because he was not a proximate cause of the accident resulting in Jason Rush's death. In response, the State maintains that the evidence was sufficient to prove that defendant was involved in the accident because drag racing was the cause of the accident and defendant was involved in the drag race.

Subsections (a) and (b) of section 11--401 of the Vehicle Code, entitled "Motor vehicle accidents involving death or personal injuries," provide:

"(a) The driver of any vehicle involved in a motor vehicle accident resulting in personal injury to or death of any person shall immediately stop such vehicle at the scene of such accident, or as close thereto as possible and shall then forthwith return to, and in every event shall remain at the scene of the accident until the requirements of Section 11--403 have been fulfilled. Every such stop shall be made without obstructing traffic more than is necessary.

(b) Any person who has failed to stop or to comply with the requirements of paragraph (a) shall, as soon as possible but in no case later than one hour after such motor vehicle accident, or, if hospitalized and incapacitated from reporting at any time during such

-7-

period, as soon as possible but in no case later than one hour after being discharged from the hospital, report the place of the accident, the date, the approximate time, the driver's name and address, the registration number of the vehicle driven, and the names of all other occupants of such vehicle, at a police station or sheriff's office near the place where such accident occurred. No report made as required under this paragraph shall be used, directly or indirectly, as a basis for the prosecution of any violation of paragraph (a)." 625 ILCS 5/11--401(a), (b) (West 2002).

When a court reviews the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); People v. Collins, 106 Ill. 2d 237, 261 (1985). Under this standard, a reviewing court must construe all reasonable inferences from the evidence in favor of the prosecution. People v. Bush, 214 Ill. 2d 318, 326 (2005). The issue in this case is whether the evidence presented at trial was sufficient to meet the "involved in a motor vehicle accident" element of the offense of leaving the scene of an accident involving the death of a person. The interpretation of the essential elements of a criminal offense presents an issue of statutory construction. The cardinal rule of statutory construction is to give effect to the true intent of the legislature. People v. Whitney, 188 Ill. 2d 91, 97 (1999). The best indication of the legislature's intent is the language of the statute itself. Whitney, 188 Ill. 2d at 97. There is no rule of construction that allows a court to declare that the legislature did not mean what the plain language of the statute imports. People v. Woodard, 175 Ill. 2d 435, 443 (1997). Thus, "[w]here the statutory language is clear, it will be given effect without resort to other aids for construction." People v.

Hickman, 163 Ill. 2d 250, 261 (1994).  Questions of statutory construction are reviewed de novo. People v. Davis, 199 Ill. 2d 130, 135 (2002).

In support of his contention that the evidence was insufficient, defendant asks us to adopt the interpretation of the phrase "involved in a motor vehicle accident" in the dissenting opinion to this court's decision in People v. Kerger, 191 Ill. App. 3d 405 (1989).  The essential facts and holdings of Kerger follow.

In Kerger, testimony at a bench trial established that a pedestrian attempting to cross the road was struck by the left side of the defendant's vehicle, appeared to tumble or fall, and was hit head on by the vehicle following directly behind the defendant's vehicle.  Kerger, 191 Ill. App. 3d at 407.  The pedestrian died as a result of the injuries sustained in the accident.  Kerger, 191 Ill. App. 3d at 407. The defendant testified that she observed the pedestrian crossing the road toward her vehicle, was forced to swerve sharply to the right to avoid hitting the pedestrian, and "heard a 'thump' toward the rear of her vehicle."  Kerger, 191 Ill. App. 3d at 407.  The defendant testified that she did not know if the pedestrian came in contact with her vehicle, but shortly after the accident a witness heard her say, "[M]y God, I hit him; I can't believe I hit him."  Kerger, 191 Ill. App. 3d at 408.  In finding the defendant guilty of violating section 11--401, the trial court found that the defendant did not actually make contact with the pedestrian with her vehicle,  ruled that contact was unnecessary to constitute involvement in an accident, and concluded that the defendant was involved in the accident within the meaning of section 11--401 of the Vehicle Code.  Kerger, 191 Ill. App. 3d at 408.

On appeal, the defendant in Kerger contended, among other things, that "because there was no physical contact between her vehicle and the pedestrian nor 'substantial implication or connection' between her vehicle and the pedestrian she was not 'involved' in a motor vehicle accident."  Kerger,

191 Ill. App. 3d at 408. In rejecting the defendant's contention, the majority in Kerger held that there need not be physical contact with the driver's vehicle for a driver to be deemed to have been "involved in a motor vehicle accident" within the meaning of section 11--401. Kerger, 191 Ill. App. 3d at 409-10. In support of its conclusion, the majority cited opinion No. S--1430 of the Illinois Attorney General (1979 Ill. Att'y Gen. Op. 57). The majority noted that "[t]he words 'involved in an accident' within the statute were construed by the Attorney General to mean 'implicated in an accident or connected with the accident in a substantial manner.' " Kerger, 191 Ill. App. 3d at 410, quoting 1979 Ill. Att'y Gen. Op. at 59. The majority emphasized that it was unnecessary to determine, for purposes of deciding whether the defendant was involved in a motor vehicle accident, whether the defendant caused or was at fault for the accident. Kerger, 191 Ill. App. 3d at 410-11. The majority concluded that under the facts of the case before it, the "defendant was 'involved in a motor vehicle accident.' " Kerger, 191 Ill. App. 3d at 410.

The dissenting justice believed that the majority interpreted section 11--401 too broadly. Kerger, 191 Ill. App. 3d at 412 (McLaren, J., dissenting). The dissent proposed the following interpretation of the "involved in a motor vehicle accident" language of section 11--401:

"I believe the intent of the legislature was that any individual who drove a motor vehicle and who may have been the proximate cause or a proximate cause, or who made contact with any other vehicle, person, or other instrumentality which was involved in the auto accident is required to stop and give information as required under sections 11--401(b) and 11--403 of the Code." Kerger, 191 Ill. App. 3d at 414 (McLaren, J., dissenting).

We decline defendant's invitation to adopt the interpretation of the statute advanced by the dissenting justice in Kerger, and we continue to adhere to the "substantial implication or connection

with the accident in a substantial manner" definition of the phrase "involved in a motor vehicle accident" that was cited by the Kerger majority. Our function is to enforce the statute as enacted. People v. O'Malley, 356 Ill. App. 3d 1038, 1044 (2005). The Kerger majority's definition is in keeping with the plain meaning rule. Among the common definitions of the term "involved" are "implicated" (Webster's Third New International Dictionary 1191 (1993)) and "connected by participation or association" (The American Heritage Dictionary of the English Language 950 (4th ed. 2000)).

Moreover, if, as urged by the dissent in Kerger, the General Assembly intended that, in the absence of contact, the driver needs to be a proximate cause of the accident in order to be "involved in a motor vehicle accident," it would have explicitly so stated in section 11--401(a). The General Assembly has used the term "proximate cause" in criminal statutes where it deemed the concept appropriate. See, e.g., 625 ILCS 5/11--501(d)(1)(C) (West 2002) (aggravated driving under the influence of alcohol, involving a motor vehicle accident that resulted in great bodily harm or permanent disability or disfigurement to another, when the violation was a proximate cause of the injuries); 625 ILCS 5/11--501(d)(1)(E) (West 2002). In choosing the word "involved," the General Assembly exhibited an intent to assign to all drivers connected to motor vehicle accidents the duties of stopping, rendering aid, and providing information, without regard to fault.

Furthermore, the definition of the term "involved" advanced by the majority in Kerger is consistent with the weight of authority of other jurisdictions interpreting similar language in similar statutes. Contrary to the interpretation advanced by the dissenting justice in Kerger, that weight of authority has held that a person can be "involved in" an accident without being a legal or proximate cause of the accident. State v. McDonnell, Nos. CR.A. 05--11--1879, CR.A. 05--11--1880, CR.A.

-11-

05--11--1881, 0511017233 cons. (March 23, 2006) ("involved in an accident" means being connected with an accident in a natural or logical manner or implicated in or entangled with the final event, even if not the proximate cause of the accident); People v. Oliver, 242 Mich. App. 92, 97, 617 N.W.2d 721, 724 (2000) (motorist is "involved in an accident" if evidence demonstrates that the motorist was implicated in or connected with the accident in a logical or substantial manner; driver need not have caused accident in order to have been "involved in" accident); State v. Simpson, 160 Vt. 220, 223-24, 627 A.2d 346, 349 (1993) (statute applies not only to those persons whose conduct was the proximate cause of the accident, but also to those persons whose actions were precipitating or contributing factors to the accident); State v. Carpenter, 334 N.W.2d 137, 140 (Iowa 1983) (statute does not require a collision between the driver's vehicle and another vehicle or person and does not require that the driver's conduct be a proximate cause of the accident; "involved" means "to relate closely"); People v. Bammes, 265 Cal. App. 2d 626, 636, 71 Cal. Rptr. 415, 422 (1968) (one is involved in an accident when one is "connected with (an accident) in a natural or logical manner," and one can be involved in an accident without being its legal cause).

In this case, after hearing the evidence presented at trial, the jury concluded that the State had proven beyond a reasonable doubt that defendant and Jason Rush were drag racing.

> " 'Drag racing' means the act of 2 or more individuals competing or racing on any street or highway in this State in a situation in which one of the motor vehicles is beside or to the rear of a motor vehicle operated by a competing driver and the one driver attempts to prevent the competing driver from passing or overtaking, either by acceleration or maneuver, or one or more individuals competing in a race against time on any street or highway in this State." 625 ILCS 5/11--504 (West 2002).

Irrespective of whether defendant's conduct in this case was a factual, legal, or proximate cause of Jason Rush's death, the circumstance that defendant was engaged in a drag race on a public street during which defendant's opponent encountered another vehicle at such a high rate of speed that he could not avoid colliding with that vehicle without losing control and crashing was sufficient to establish that defendant was implicated in the accident or connected with the accident in a substantial manner. Thus, the State proved beyond a reasonable doubt that defendant was "involved in a motor vehicle accident" within the meaning of that language in section 11--401.

B. As-Applied Constitutional Challenge to Section 11--401

Defendant does not maintain that he complied with the requirements of subsection (a) or (b) of section 11--401 but, rather, contends that the statute is unconstitutionally vague as applied to his conduct in this case. Specifically, defendant argues that the language "involved in a motor vehicle accident" is vague and ambiguous with respect to his conduct, because an ordinary person could not ascertain whether his conduct constituted involvement in a motor vehicle accident. Defendant argues further that, because he did not make physical contact with Jason Rush's automobile and was not the proximate cause of the accident, the statute did not provide a clear standard as to whether he was "involved in a motor vehicle accident." In response, the State submits that the language "involved in a motor vehicle accident" is not vague when applied to defendant's conduct. The State argues that a person of ordinary intelligence would know that the driver of a vehicle drag racing with another vehicle at the time the other vehicle goes out of control and crashes, resulting in the death of the driver of the other vehicle, was "involved" in the accident. We agree with the State.

Statutes are presumed to be constitutional, and the party challenging the validity of the statute has the burden to clearly establish its constitutional invalidity. People v. Wilson, 214 Ill. 2d 394, 398-

99 (2005). We must construe a statute so as to affirm its constitutionality, if the statute is reasonably capable of such a construction. Wilson, 214 Ill. 2d at 399.

"A defendant can challenge a statute as unconstitutionally vague in two ways: (1) on the statute's face, or (2) as the statute is applied to defendant's actions." People v. Einoder, 209 Ill. 2d 443, 448 (2004). A facial challenge seeks to invalidate the statute itself. "A statute [that] is facially invalid has no force and effect upon any person or entity regardless of the specific circumstances" (People v. Nance, 189 Ill. 2d 142, 146 (2000)), and, therefore, the State may not enforce the statute under any circumstances. In contrast, in an "as-applied" challenge, the party challenging the statute contends that the application of the statute in the particular context in which the challenger has acted, or in which he proposes to act, would be unconstitutional. An "as-applied" challenge requires a party to show that the statute violates the constitution as the statute applies to him. People v. Garvin, 219 Ill. 2d 104, 117 (2006). If a statute is unconstitutional as applied, the State may continue to enforce the statute in circumstances where it is not unconstitutional. In his appellate brief, defendant explicitly states that he is challenging the statute as applied to his conduct.

"In cases that do not involve first amendment freedoms, due process is satisfied if: (1) the statute's prohibitions are sufficiently definite, when measured by common understanding and practices, to give a person of ordinary intelligence fair warning as to what conduct is prohibited, and (2) the statute provides sufficiently definite standards for law enforcement officers and triers of fact that its application does not depend merely on their private conceptions." Wilson, 214 Ill. 2d at 399, citing People v. Falbe, 189 Ill. 2d 635, 639-40 (2000).

The proscription of a criminal statute must be clearly defined and provide a sufficiently definite warning of the prohibited conduct as measured by common understanding and practices. People v. Jihan, 127 Ill. 2d 379, 385 (1989). A criminal statute must be definite so that a person of ordinary intelligence will have a reasonable opportunity to know what conduct is prohibited. Jihan, 127 Ill. 2d at 385. If the defendant's conduct clearly falls within the statute's proscriptions, prosecuting him does not offend due process even though the statute might be vague as to other conduct in other circumstances. Wilson, 214 Ill. 2d at 399.

Applying the two-part analysis outlined above, we cannot agree with defendant's contention that the statutory language, "involved in a motor vehicle accident," is unconstitutionally vague as applied to his situation. First, we hold that the language is definite enough, when measured by common understanding and practices, to afford a person of ordinary intelligence in defendant's position with fair warning of his duties. Where statutory terms are not defined in the statute, they are given their ordinary and popularly understood meanings. People v. Bailey, 167 Ill. 2d 210, 229 (1995). As noted above, the plain and ordinary meaning of "involved in a motor vehicle accident" is a substantial implication or connection with the accident in a substantial manner. A reasonable person of ordinary intelligence in defendant's position would have concluded that he was implicated in or substantially connected with the motor vehicle accident that occurred during the drag race in which he was participating. Drag racing participants intentionally foster a dangerous environment of excessive speed and reckless driving and are thus almost always connected with accidents that occur with participants or other motorists during the race. A person of ordinary intelligence, as a driver engaged in an impromptu drag race on a public street, whose opponent, due to excessive speed, loses control of his vehicle while avoiding a collision with another motorist, would conclude

that he was implicated in or substantially connected with the accident. In fact, defendant's trial testimony that he did not believe that he was involved in the accident is belied by his testimony as to the circumstances surrounding the crash. After the driver of the black Mustang revved his engine at defendant, defendant took off "kind of fast," and defendant engaged the driver of the black Mustang in a speed contest when he accelerated after the black Mustang overtook defendant's vehicle. Furthermore, Tammy Rezin testified that defendant, in response to her accusation that defendant and Jason Rush were racing, said "we couldn't have been going more than 50 miles an hour." This response demonstrates his contemporaneous understanding that he and Jason Rush were connected in some way prior to the accident. The foregoing conduct showed that defendant believed he was, and in fact was, implicated in the accident or connected with the accident in a substantial manner.

Second, as applied to the facts of this case, section 11--401 provides sufficiently definite standards for law enforcement and triers of fact such that its application does not depend only on their private conceptions. During the course of this investigation, police learned that defendant and Jason Rush were drag racing at a speed in excess of 80 miles per hour when Jason Rush had to take evasive action to avoid Jody Gaunt's Cavalier, which led to an accident resulting in Jason Rush's death. Under these circumstances, any law enforcement officer or trier of fact would understand that defendant was implicated in the accident or was connected with the accident in a substantial manner such that section 11--401 applied, and they would not have to rely on private conceptions as to what constitutes being "involved in a motor vehicle accident." Defendant's conduct in this case clearly invoked the duties of section 11--401. Thus, prosecuting him does not offend due process on vagueness grounds even though the statute might be vague as to other conduct in other circumstances

(Wilson, 214 Ill. 2d at 399). Accordingly, we conclude that defendant has failed to establish that the statute is unconstitutionally vague as applied to his conduct in this case.

C. As-Applied Challenge to Section 11--401(b) on Fifth Amendment Grounds

Defendant's third appellate contention is that, as applied to his conduct, section 11--401(b) violated his constitutional privilege against self-incrimination,[2] because the mandatory reporting requirements of section 11--401(b) exposed him to criminal liability for failing to divulge incriminating information that could have been used against him. In response, the State argues that defendant has failed to show that there would have been any real or substantial risk of self-incrimination had he complied with the statute. We agree with the State.

The fifth amendment to the United States Constitution states that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. A communication must be testimonial, incriminating, and compelled in order to qualify for the fifth amendment protection. Hiibel v. Sixth Judicial District Court of Nevada, 542 U.S. 177, 189, 159 L. Ed. 2d 292, 305, 124 S. Ct. 2451, 2460 (2004). "[T]he Fifth Amendment privilege against compulsory self-incrimination 'protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.' "

---

[2]Defendant does not specify whether his contention is that the federal, the state, or both constitutional provisions protecting against compelled self-incrimination were violated by operation of section 11--401(b). Nevertheless, because our supreme court has interpreted article I, section 10, of the Illinois Constitution in lockstep with the fifth amendment to the United States Constitution (see People v. Caballes, 221 Ill. 2d 282, 301 (2006)), our analysis would be the same under either provision.

<u>Hiibel</u>, 542 U.S. at 190, 159 L. Ed. 2d at 305, 124 S. Ct. at 2460, quoting <u>Kastigar v. United States</u>, 406 U.S. 441, 445, 32 L. Ed. 2d 212, 217, 92 S. Ct. 1653, 1656 (1972).

In rejecting a facial challenge to a California statutory requirement that motorists who have been involved in an accident must stop at the scene and give their names and addresses, the United States Supreme Court held in <u>California v. Byers</u>, 402 U.S. 424, 29 L. Ed. 2d 9, 91 S. Ct. 1535 (1971), that disclosure of one's identity is not a self-incriminating act. Similarly, in <u>People v. Lucus</u>, 41 Ill. 2d 370, 372 (1968), our supreme court held that a former statute requiring that a driver involved in an accident resulting in damage to a vehicle provide his name, address, and registration number to persons in the other vehicle (Ill. Rev. Stat. 1965, ch. 95½, par. 134) did not violate the fifth amendment, because "the statute's provisions do not present a substantial and real hazard of incrimination." <u>Lucus</u>, 41 Ill. 2d at 374. The court noted that the act of identification, by itself, in no way relates to the circumstances of the accident or provides information concerning the details of the event. <u>Lucus</u>, 41 Ill. 2d at 374.

In mounting his as-applied challenge to section 11--401(b), defendant directs our attention to the United States Supreme Court's decision in <u>Hiibel</u> wherein the Court rejected an as-applied challenge to a Nevada law requiring subjects of <u>Terry</u> stops to state their names. The Court held that Hiibel's "refusal to disclose his name was not based on any articulated real and appreciable fear that his name would be used to incriminate him, or that it 'would furnish a link in the chain of evidence needed to prosecute' him." <u>Hiibel</u>, 524 U.S. at 190, 159 L. Ed. 2d at 305, 124 S. Ct. at 2461, quoting <u>Hoffman v. United States</u>, 341 U.S. 479, 486, 95 L. Ed. 1118, 1124, 71 S. Ct. 814, 818 (1951). However, the Court noted:

"[A] case may arise where there is a substantial allegation that furnishing identity at the time of a stop would have given police a link in the chain of evidence needed to convict the

-18-

individual of a separate offense. In that case, the court can then consider whether the privilege applies, and, if the Fifth Amendment has been violated, what remedy must follow."

Hiibel, 524 U.S. at 191, 159 L. Ed. 2d at 306, 124 S. Ct. at 2461.

Defendant maintains that this case illustrates a factual situation in which section 11--401(b) posed a real danger of self-incrimination because the statute obligated him to admit to the police that he was involved in an accident resulting in someone's death where such admission could be used against him in a prosecution for the separate offense of aggravated reckless driving, an offense requiring proof that the reckless driving caused great bodily harm or permanent disability or disfigurement to another (625 ILCS 5/11--503(c) (West 2002); Illinois Pattern Jury Instructions, Criminal, No. 23.31X (4th ed. 2000)). Defendant argues that he reasonably believed that providing the information required by section 11--401(b) could be used in a criminal prosecution. Specifically, defendant argues that if he admitted to being involved in the accident, the trier of fact could then infer that he admitted causing the accident, and thereby conclude that the State established an essential element of the separate offense of aggravated reckless driving. For the reasons that follow, we conclude that any belief on defendant's part that his compliance with section 11--401(b) would result in his providing statements that could be used against him in a criminal prosecution or lead to other evidence that might be so used was not reasonable.

Defendant has not established that reporting to the police the place of the accident, the date, the approximate time, his name and address, the registration number of his vehicle, and the names of all other occupants in his vehicle at the time of the accident, in compliance with section 11--401(b), would have incriminated him in a criminal proceeding on a separate offense. In light of our conclusion that the plain meaning of the term "involved" in section 11--401 is "implicated in or connected with the accident in a substantial manner," defendant has not convinced us that an inference

of some level of causation would be reached from an admission of involvement. As noted in the first section of our analysis, a person can be "involved in a motor vehicle accident" even where he or she was not a cause of the accident. It is unnecessary to determine, for purposes of deciding whether a defendant was involved in a motor vehicle accident, whether the defendant caused or was at fault for the accident. Kerger, 191 Ill. App. 3d at 410-11. "[Section 11--401(b)] does not concern itself with how the accident came about." People v. Bennett, 329 Ill. App. 3d 502, 517 (2002). Therefore, contrary to defendant's argument, a person who admits involvement in an accident does not also admit that he or she caused the accident. Accordingly, defendant's compliance with section 11--401(b), resulting in an implied admission of involvement in the motor vehicle accident, would not have amounted to a real danger of self-incrimination or provided the State with a link in the chain of evidence needed to prosecute him for the separate offense of aggravated reckless driving.

Aside from our conclusion that defendant has not demonstrated that compliance with section 11--401(b) would have incriminated him, we note that the Court in Byers rejected an argument similar to the one made by defendant, on the ground that an inference of involvement was not testimonial and therefore not protected by the fifth amendment:

"Respondent argues that since the statutory duty to stop is imposed only on the 'driver of any vehicle involved in an accident,' a driver's compliance is testimonial because his action gives rise to an inference that he believes that he was the 'driver of [a] vehicle involved in an accident.' From this, the respondent tells us, it can be further inferred that he was indeed the operator of an 'accident involved' vehicle. In Wade, however, the Court rejected the notion that such inferences are communicative or testimonial. There the respondent was placed in a lineup to be viewed by persons who had witnessed a bank robbery. At one point he was compelled to speak the words alleged to have been used by the perpetrator. Despite the

inference that the respondent uttered the words in his normal undisguised voice, the court held that the utterances were not of a 'testimonial' nature in the sense of the Fifth Amendment privilege even though the speaking might well have led to identifying him as the bank robber. [Citation.] Furthermore, the Court noted in Wade that no question was presented as to the admissibility in evidence at trial of anything said or done at the lineup. [Citation.] Similarly, no such problem is presented here. Of course, a suspect's normal voice characteristics, like his handwriting, blood, fingerprints, or body may prove to be a crucial link in a chain of evidentiary factors resulting in prosecution and conviction. Yet such evidence may be used against a defendant." Byers, 402 U.S. at 433, 29 L. Ed. 2d at 20, 91 S. Ct. at 1540.

We believe that the foregoing reasoning is applicable in this case and hold further that any inference resulting from defendant's compliance with section 11--401(b) would not have been testimonial or communicative and thus afforded protection under the fifth amendment.

Defendant also argues that danger of self-incrimination was further heightened because section 11--401(b) mandates reporting the requisite information to the police within one hour of the accident and one hour was not enough time for him to consult with a lawyer or hire a lawyer to accompany him to the police station. Defendant concludes that his being unrepresented, young, scared, and not in custody and therefore not subject to being advised of his Miranda warnings, increased the chances of the police extracting an incriminating statement from him. This argument is speculative. The statute did not require defendant to make any statement to the police regarding the cause of the accident or the events surrounding it. It is conjecture to conclude that defendant would not have had enough time to obtain legal advice or would have been scared to talk to law enforcement personnel at a police station or sheriff's office or that at 19 years of age he was particularly susceptible to a

-21-

presumed police effort to extract incriminating information from him without needing to give him the benefit of <u>Miranda</u> warnings.

In sum, defendant has failed to establish that, under the circumstances of this case, his compliance with section 11--401(b) would have provided the State with incriminating information in violation of his fifth amendment protection from compulsory self-incrimination. Consequently, we reject defendant's as-applied challenge to the statute on fifth amendment grounds.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Winnebago County.

Affirmed.

GROMETER, P.J., and HUTCHINSON, J., concur.