2017 IL App (1st) 142837

SECOND DIVISION
December 26, 2017

No. 1-14-2837

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 10 CR 1904 |
| | ) | |
| RALPH EUBANKS, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MASON delivered the judgment of the court, with opinion.
Presiding Justice Neville concurred in the judgment and opinion.
Justice Pucinski dissented, with opinion.

**OPINION**

¶ 1     Defendant Ralph Eubanks was arrested after a hit-and-run accident that killed Maria Worthon and injured her six-year-old son, Jeremiah Worthon. Witnesses estimated Eubanks to have been driving at 60 to 90 miles per hour. After his arrest, Eubanks was forcibly subjected to blood and urine tests, the latter of which tested positive for cannabis, ecstasy, and cocaine metabolite.

¶ 2     Following a jury trial, Eubanks was found guilty of first degree murder, failure to report a motor vehicle accident involving death or injury, and aggravated driving under the influence. On appeal, he argues (i) the trial court erred by not instructing the jury on reckless homicide as a lesser-included offense of first degree murder, (ii) his conviction for failure to report an accident must be reversed where the State failed to prove that he did not report the accident at a police station within half an hour, (iii) the statute authorizing warrantless, nonconsensual blood and

urine tests is unconstitutional, both on its face and as applied in Eubanks's case, and (iv) improper comments by the prosecutor denied Eubanks a fair trial.

¶ 3    We agree with Eubanks on the first three points and, therefore, need not reach the fourth. Accordingly, we (i) reverse Eubanks's conviction for first degree murder and remand for a new trial on that charge, (ii) reduce his conviction for Class 1 failure to report an accident to the Class 4 version of the offense in the same statute (625 ILCS 5/11-401(a), (c) (West 2008)), and (iii) reverse Eubanks's conviction for aggravated driving under the influence.

¶ 4                              BACKGROUND

¶ 5                            Suppression Hearing

¶ 6    Before trial, Eubanks moved to suppress the result of his blood and urine tests, arguing that the tests were an unconstitutional search because Eubanks did not consent to be tested, the police did not have a warrant, and there were no exigent circumstances excusing the failure to obtain one. Eubanks also filed a motion to declare unconstitutional section 11-501.2(c)(2) of the Illinois Vehicle Code (625 ILCS 5/11-501.2(c)(2) (West 2008)), the statute under which the testing was performed:

> "[I]f a law enforcement officer has probable cause to believe that a motor vehicle driven by or in actual physical control of a person under the influence of alcohol, other drug or drugs, or intoxicating compound or compounds, or any combination thereof has caused the death or personal injury to another, that person shall submit, upon the request of a law enforcement officer, to a chemical test or tests of his or her blood, breath or urine for the purpose of determining the alcohol content thereof or the presence of any other drug or combination of both."

¶ 7        At the hearing on Eubanks's motions, the parties did not present evidence but proceeded by way of stipulation to the following facts. On December 21, 2009, at 9:05 p.m., Eubanks was arrested in connection with a hit-and-run accident that killed Maria and injured Jeremiah. The police had probable cause to arrest Eubanks for driving under the influence. At the police station, Eubanks refused to take a breathalyzer test or to submit to blood and urine tests. At 2:53 a.m., an officer took Eubanks to the hospital, telling him that he was required by law to submit to blood and urine tests. Eubanks was physically restrained by hospital security and a blood sample was taken at 4 a.m. The nurse then asked for urine, but Eubanks refused to urinate. The nurse threatened to catheterize him. As she approached him with a catheter, he urinated, and a sample was collected at 5:20 a.m. The samples were sent to the crime lab for analysis. Eubanks's blood produced negative results for alcohol or any illegal substance, but his urine tested positive for cannabis, ecstasy, and cocaine metabolite.

¶ 8        The trial court denied Eubanks's motions to suppress his test results and to declare section 11-501.2(c)(2) unconstitutional.

¶ 9                                    Trial

¶ 10        Shortly before 9 p.m. on December 21, 2009, in the Rogers Park neighborhood of Chicago, Felix Worthon was walking home with his wife Maria and their son Jeremiah near the intersection of Greenview and Greenleaf Avenues. Maria and Jeremiah stopped to talk to Maurice Glover, a man from their church. Felix crossed the street ahead of them. As he was crossing, he heard a sound behind him; he turned around and was nearly hit by a car. The car struck Maria and Jeremiah and kept going without stopping. The force of the impact knocked Maria's body a block away. Maria died immediately, and Jeremiah suffered permanent injuries.

¶ 11     Madeline Moratto and Alex Montejo were walking down the sidewalk when they witnessed the collision. Moratto estimated the car's speed to be 80 miles per hour, and Montejo estimated it at 60 miles per hour. Both testified that the car's headlights were off, and it did not stop or slow down after the collision. Glover, who also witnessed the collision, estimated the car's speed at 80 to 90 miles per hour.

¶ 12     Calvin Tanner was a passenger in the car with Eubanks when the collision occurred. Tanner and his cousin, Dennis Jeter, were friends with Eubanks. Jeter owned a green Pontiac, which he loaned to Eubanks a few days before the accident occurred. On December 21, 2009, Tanner and Jeter were at their grandmother's house with Eubanks. The three had earlier purchased vodka together. Tanner and Jeter both drank, but neither could remember whether Eubanks had anything to drink.

¶ 13     That night, Eubanks took Jeter's car to drive Tanner to pick up a futon. Officers Brian Murphy and Chris Wertepeny, on patrol in an unmarked squad car, observed Eubanks shortly before 9 p.m. driving at high speed with no headlights. The officers curbed his vehicle, but when they exited their squad car and approached, Eubanks drove away southbound at a high rate of speed. He sped through the next intersection—a "busy intersection," according to Murphy—without stopping at the stop sign. The officers lost sight of his car within seconds.

¶ 14     At the intersection of Greenview and Greenleaf, after speeding by a church with a U-Haul truck parked in front, Eubanks struck Maria and Jeremiah. The impact knocked out the car's entire front windshield; Tanner had glass in his mouth and was bleeding. Fearing that they had struck a person, Tanner said to Eubanks, "I hope you didn't do what I thought you did." Eubanks told him, "It's too late," and continued driving without slowing or stopping.

¶ 15    After driving the car down an alleyway, Eubanks finally stopped and both men got out. Tanner called Jeter and told him, "Your car's been wrecked." Tanner also told Eubanks that he should return to the site of the collision, but Eubanks refused. Eubanks got back in the car without Tanner and drove away.

¶ 16    Jeter arrived and Tanner brought him to the scene of the accident, where they saw a body on the ground covered by a blanket. Both men spoke to police. Tanner told them that he was a passenger in the vehicle involved in the collision and that Eubanks was the driver. He denied telling police that the vehicle was going 60 to 70 miles per hour and that nothing was obstructing their view. Jeter told the police that he had loaned his vehicle to Eubanks.

¶ 17    Meanwhile, officers Jennifer Escher, Scott Pierson, and Patrick McHugh were on patrol when they received a radio call about a hit-and-run accident involving a green Pontiac with license plate H37583. Escher saw the Pontiac in an alleyway and approached it at 50 miles per hour, but the Pontiac sped away, and she lost sight of it. Escher, Pierson, and McHugh all saw the Pontiac on Newgard Avenue. Pierson drove his squad car in front of the Pontiac. The Pontiac went into reverse, lost control, and, in Pierson's words, "started ping-ponging off parked cars." Eubanks jumped out of the Pontiac and attempted to flee on foot, but he was apprehended by Officer John Ventrella and taken into custody at 9:05 p.m.

¶ 18    At 10:30 p.m., Ventrella interviewed Eubanks at the police station. Eubanks appeared carefree and "relatively unaffected by the whole incident." Ventrella testified that he could smell alcohol on Eubanks but did not offer any opinion as to whether he was intoxicated. At the time the case was being directed by officers from the major accident unit, other officers were conducting various aspects of the investigation, such as interviewing witnesses to the hit-and-run accident.

¶ 19　　At 12 a.m., Ventrella informed Eubanks that he was under arrest for driving under the influence, and he read him his motorist rights. Ventrella asked Eubanks to take a breathalyzer test, but Eubanks refused; Eubanks also refused to submit blood and urine for testing. At that point, Ventrella "basically stood by and waited for instruction" from the major accident unit.

¶ 20　　Later, Ventrella was instructed to bring Eubanks to the hospital to obtain blood and urine samples from him, which he did at 2:57 a.m. When a nurse approached Eubanks to draw blood, Eubanks became combative and pulled his arm away. Security officers entered and restrained him, allowing the nurse to draw his blood at around 4 a.m. Eubanks also refused to give a urine sample, claiming that he could not urinate. A catheter was ordered for him; as the nurse approached to insert the catheter, Eubanks urinated on his own at 5:20 a.m.

¶ 21　　Eubanks was taken back to the police station, and Ventrella again spoke with him at 5:54 a.m. A video of this conversation was played for the jury in which Eubanks asked to go to the bathroom, explaining that he earlier drank a quart of Hennessy.

¶ 22　　Forensic scientists with the Illinois State Police laboratory testified that Eubanks's blood sample tested negative for any alcohol or drugs, but his urine sample tested positive for cannabis and its metabolite, ecstasy and its metabolite, and cocaine metabolite. Colleen Lord, who in 2009 was a forensic scientist working for the Illinois State Police laboratory, explained that the body converts drugs to metabolites over time as part of the metabolic process.

¶ 23　　Eubanks, testifying on his own behalf, stated that Jeter was the driver that night and that Eubanks was not present for the crash. According to Eubanks, on December 21, 2009, Jeter called Eubanks and asked him to return his car so that Jeter could take Tanner to go pick up a futon. Eubanks met Jeter and Tanner at their grandmother's house, where they had drinks

together. All three of them went to Tanner's apartment. Then Jeter and Tanner left to get the futon, while Eubanks stayed behind to save Jeter's parking space for him.

¶ 24　　　After they left, while Eubanks was still standing outside in the parking space, he received a call from Tanner, who said that they had been in an accident. Eubanks started walking toward the accident scene. As he neared the area, police also arrived on the scene. Eubanks ran away from them because he was carrying marijuana. The police chased him, tackled him, and brought him to the police station.

¶ 25　　　On cross-examination, Eubanks reiterated that he was nowhere near the car crash when it occurred; at 9 p.m., he was standing in a parking spot waiting for Jeter and Tanner to return. Regarding his drug and alcohol usage, he admitted that on the day of the accident he drank a quart of Hennessey. He smoked marijuana a week before the accident (but not on that day) and also took an ecstasy pill two days prior. He denied taking any cocaine, though he speculated that the ecstasy pill might have been mixed with cocaine.

¶ 26　　　At the jury instructions conference, Eubanks requested that the jury be instructed on reckless homicide as a lesser included offense of first degree murder. The court denied his request, stating that if the State's evidence was believed, Eubanks's actions "could only create a strong probability of death or great bodily harm to some individual."

¶ 27　　　The jury found Eubanks guilty of first degree murder, failure to report a motor vehicle accident involving death or injury, and aggravated driving under the influence. Eubanks was sentenced to 40 years' imprisonment.

¶ 28　　　　　　　　　　　　　　　　　ANALYSIS

¶ 29　　　We address three contentions Eubanks raises on appeal: (i) his conviction for first degree murder should be reversed because the trial court failed to instruct the jury on reckless homicide

as a lesser-included offense; (ii) his conviction for failure to report an accident must be reversed where the State failed to prove that he did not report the accident at a police station within half an hour; and (iii) his conviction for aggravated driving under the influence must be reversed because the warrantless, nonconsensual testing of Eubanks's blood and urine was an unconstitutional search inside his body.

¶ 30                                    Reckless Homicide Instruction

¶ 31        Eubanks first argues that he was entitled to a jury instruction on reckless homicide since there was some evidence that he acted recklessly in causing Maria's death. The State argues that the instruction was properly denied since there was no evidence of recklessness presented at trial. We agree with Eubanks.

¶ 32        Initially, Eubanks does not argue that the evidence is insufficient to convict him of first degree murder, nor could he reasonably do so. See *People v. Alsup*, 373 Ill. App. 3d 745, 754 (2007) (evidence was sufficient to support conviction for first degree murder where defendant stole a van and led police on a high-speed chase, disregarding traffic control devices and trying to ram a police car); *People v. Thomas*, 266 Ill. App. 3d 914, 926-27 (1994) (evidence was sufficient to support conviction for first degree murder where defendant led police on high-speed chase down congested street, ran red light at intersection without slowing down, and collided with car traveling in cross-traffic); *People v. Stevens*, 324 Ill. App. 3d 1084, 1093 (2001) (evidence supported defendant's guilty plea to first degree murder where "defendant drove a stolen car at speeds in excess of 100 miles an hour, drove it on the shoulder of an expressway, weaved through traffic, refused to stop for marked police units, and drove it into the rear of the victim's vehicle"). Rather, Eubanks argues that there was sufficient evidence of his recklessness that the jury should have been instructed on both reckless homicide and first degree murder.

Indeed, in both *Alsup* and *Thomas*, the trial court determined that there was sufficient evidence of recklessness to issue an instruction on reckless homicide to the jury. *Alsup*, 373 Ill. App. 3d at 754; *Thomas*, 266 Ill. App. 3d at 925.

¶ 33     A defendant is entitled to an instruction on a lesser-included offense if there is some evidence in the record that, if believed by the jury, would reduce the crime charged to a lesser offense. *People v. McDonald*, 2016 IL 118882, ¶ 25. That is, the evidence must permit a rational jury to acquit the defendant of the greater offense but still find him guilty of the lesser offense. *People v. Patel*, 366 Ill. App. 3d 255, 275 (2006); see also *People v. Martin*, 236 Ill. App. 3d 112 (1992) (trial court errs in giving a lesser-offense instruction where the evidence would support either a conviction on the greater offense or a verdict of not guilty, but not a conviction on the lesser offense). When the trial court determines that there is insufficient evidence to justify giving a jury instruction, we review that determination for abuse of discretion. *McDonald*, 2016 IL 118882, ¶ 42.

¶ 34     The primary distinction between first degree murder and reckless homicide is the mental state of the defendant. *People v. Pollard*, 2015 IL App (3d) 130467, ¶ 27. Under section 9-1(a)(2) of the Criminal Code of 1961, a defendant commits first degree murder when he kills an individual without lawful justification and "knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(2) (West 2008). It is not necessary that defendant intended to kill or that he was certain that someone would die as a result of his actions. *Alsup*, 373 Ill. App. 3d at 753. As this court has explained:

> " 'A person who knows, *i.e.*, is consciously aware, that his acts create a strong probability of death to another may not have such death as his conscious objective or purpose. [Citation.] He may simply not care whether the victim lives or dies. Under these

circumstances, the person would be guilty of murder although the death was caused "unintentionally." ' " *Id.* at 753-54 (quoting *People v. Deacon*, 130 Ill. App. 3d 280, 287-88 (1985)).

On the other hand, a defendant commits reckless homicide when he unintentionally kills an individual through use of a motor vehicle and his actions "are likely to cause death or great bodily harm to some individual, and he performs them recklessly." 720 ILCS 5/9-3 (West 2008). A person acts recklessly when "he consciously disregards a substantial and unjustifiable risk *** and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2008). The question of whether a defendant acted knowingly or recklessly is typically a question to be resolved by the finder of fact (*People v. Jones*, 404 Ill. App. 3d 734, 744 (2010); see *People v. DiVincenzo*, 183 Ill. 2d 239, 253 (1998) ("inferences as to defendant's mental state are a matter particularly within the province of the jury")), as is the question of whether the defendant's acts create a "strong probability" of death or great bodily harm or whether they are merely "likely" to cause such a result (*Alsup*, 373 Ill. App. 3d at 750).

¶ 35        We find that there was sufficient evidence of Eubanks's recklessness to instruct the jury on reckless homicide. In this regard, we are guided by our supreme court's decision in *People v. Belk*, 203 Ill. 2d 187 (2003). Belk stole a van and, while being pursued by police at a high rate of speed, crashed into another vehicle, killing both occupants. At the time of the crash, Belk was under the influence of alcohol and driving at over 100 miles per hour in an area with "numerous restaurants and other establishments that were still open for business." *Id.* at 190. There were other cars on the street that pulled to the side as Belk raced past, as well as many nearby pedestrians. *Id.*; *People v. Belk*, 326 Ill. App. 3d 290, 292 (2001).

¶ 36        Although Belk was convicted of felony murder, our supreme court held that Belk's act of stealing the van was not a "forcible felony." *Belk*, 203 Ill. 2d at 195. The court also stated that the evidence "would support an inference that Belk acted recklessly and contemplated that in attempting to elude police he was likely to cause death or great bodily harm, an inference that clearly supports a conviction for reckless homicide pursuant to section 9-3 of the Code." *Id.* (citing 720 ILCS 5/9-3 (West 1996)). Thus, the court reduced Belk's felony murder conviction to reckless homicide. *Id.* at 191, 198.

¶ 37        Eubanks's actions are sufficiently comparable to Belk's actions that a rational jury could find that Eubanks acted recklessly. Both defendants fled from police at a high rate of speed (60 to 90 miles per hour for Eubanks, 100 miles per hour for Belk). At no point did either defendant apply the brakes or attempt to slow down before the fatal collision (see *Belk*, 326 Ill. App. 3d at 292). In fact, Belk's flight from police was arguably more dangerous than Eubanks's since Belk was in an area with numerous establishments open for business and other vehicular and pedestrian traffic was present, while Eubanks was in a "quiet neighborhood."

¶ 38        Another instructive case is *People v. Gittings*, 136 Ill. App. 3d 655 (1985). While intoxicated, Gittings led a police officer on a high-speed chase in an area with several small hills and curves. He was going in excess of 85 to 90 miles per hour, where the posted speed limit was 35 miles per hour and there was a cautionary 20 miles per hour speed limit on curves. It was night and Gittings did not have his headlights on. His car plunged down a ravine, killing his passenger. Under these facts, the court upheld his conviction for reckless homicide. *Id.* at 661. As with *Belk*, *Gittings* bears many of the same indicia of recklessness as the present case: a high-speed chase at night without headlights, under circumstances where high speed posed particular risks to those in the vicinity of the defendant. See also *People v. Beck*, 295 Ill. App. 3d 1050

(1998) (evidence was sufficient to support conviction for reckless homicide where defendant, while intoxicated, was driving at night in the wrong lane of traffic with his headlights off and collided with an oncoming vehicle). Thus, particularly in light of the principle that inferring a defendant's mental state is typically within the province of the jury (*DiVincenzo*, 183 Ill. 2d at 253), we find that the trial court erred in denying Eubanks's request for an instruction on reckless homicide.

¶ 39   The State nevertheless argues that the evidence of first degree murder was so strong that any failure to instruct on the lesser offense would have been harmless, citing *People v. Washington*, 375 Ill. App. 3d 243, 249 (2007). The jury in *Washington* was instructed on armed robbery and on robbery, but the trial court denied defendant's request for an instruction on theft. *Id.* at 247. The jury found defendant guilty of armed robbery. *Washington* held that, although the denial of a theft instruction was in error, such error was harmless in light of the jury's verdict. The court explained that "theft is a simple deprivation of property; robbery is a deprivation of property, plus force or the threat of force; and armed robbery is the deprivation of property, plus force or the threat of force, plus the use of a dangerous weapon." *Id.* at 249 (citing 720 ILCS 5/16-1(a)(1), 18-1(a), 18-2(a) (West 2002)). Since the jury convicted defendant of armed robbery rather than simple robbery, it must have believed that he used force or the threat of force as well as a dangerous weapon. Thus, the jury would not have found defendant guilty of theft even if given that option. *Id.* at 250. *Washington* is distinguishable because nothing in the record indicates whether the jury in this case would have found Eubanks to be guilty of reckless homicide had that instruction been given.

¶ 40   The dissent asserts that a defendant is not entitled to a lesser-included instruction if his theory of the case is that someone else committed the crime at issue. But, as noted, a defendant

need only show "*some evidence* in the record" that would reduce the crime to the lesser offense (emphasis in original) (*McDonald*, 2016 IL 118882, ¶ 25), regardless of whether that evidence was proffered by himself or by the State. For instance, in *People v. White*, 311 Ill. 356 (1924), there was an altercation at a party in which the village mayor was fatally shot. White was charged with the mayor's murder. In his defense, White testified that he did not have any gun that night and did not shoot the mayor. Nevertheless, *White* held that a lesser-included instruction on manslaughter was proper. *Id.* at 363-64; see *People v. Garcia*, 188 Ill. 2d 265, 270-71 (1999) (citing *White* with approval); see also *People v. Rogers*, 286 Ill. App. 3d 825, 829-31 (1997) (in defendant's prosecution for first degree murder, where defendant at trial denied any involvement in the shooting and presented an alibi defense, it was not improper for trial court to find him guilty of the lesser, mitigated offense of second degree murder).

¶ 41    Accordingly, we reverse Eubanks's conviction for first degree murder and remand for a new trial on that charge.

¶ 42                    Failure to Report an Accident

¶ 43    Eubanks next contends that his conviction for failure to report the accident within half an hour must be reversed because he was arrested around 10 minutes after the accident and any evidence of his postarrest silence cannot be used against him. We agree.

¶ 44    When reviewing a defendant's challenge to the sufficiency of the evidence, we must decide whether, after viewing the evidence in the light most favorable to the prosecution, a rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). It is not our place to retry the defendant; rather, the jury has the responsibility to determine

witness credibility, the weight to be accorded to conflicting testimony, and the inferences to be drawn from the evidence. *People v. Steidl*, 142 Ill. 2d 204, 226 (1991).

¶ 45    Eubanks was convicted under section 11-401 of the Illinois Vehicle Code (625 ILCS 5/11-401 (West 2008)), which provides that it is a Class 1 felony for a driver to both (1) flee the scene of a motor vehicle accident resulting in death and (2) fail to report the accident at a police station or sheriff's office within half an hour of the accident. See *People v. Patrick*, 406 Ill. App. 3d 548, 558 (2010) ("evidence that defendant failed to report the accident within one-half hour of the accident *** [is] a required element to support a section 11-401(b) conviction").

¶ 46    The trial evidence shows that at 8:58 p.m., Glover informed a 911 operator that two pedestrians had been struck by a car. At 9:05 p.m., Eubanks was taken into custody, as established by the arrest report as well as police radio traffic introduced into evidence by the State. The State argues that there is sufficient evidence to infer that Eubanks did not report the accident within half an hour, either before or after his arrest. But under Illinois law, a defendant's postarrest silence is " 'not admissible for *any* purpose in the State's case in chief.' " (Emphasis added.) *People v. Simmons*, 293 Ill. App. 3d 806, 811 (1998) (quoting *People v. Strong*, 215 Ill. App. 3d 484, 488 (1991)); see also *People v. Nesbit*, 398 Ill. App. 3d 200, 212 (2010) ("Illinois courts have consistently ruled that the State is prohibited from questioning or commenting on a defendant's postarrest silence," with limited exceptions for impeachment that are not relevant here).

¶ 47    *People v. Brady*, 369 Ill. App. 3d 836 (2007), is readily distinguishable. Brady, while drag racing with another motorist, caused the other motorist to crash. Brady then fled the scene of the accident and was not arrested until three days later—long after the time period provided for in section 11-401(b) (625 ILCS 5/11-401(b) (West 2002)). *Brady*, 369 Ill. App. 3d at 840.

Thus, Brady's conviction for leaving the scene of an accident was not contingent on evidence of his postarrest silence.

¶ 48        *People v. Young*, 2012 IL App (1st) 092124-U, ¶¶ 38-39, the other case cited by our dissenting colleague, is an unpublished order pursuant to Illinois Supreme Court Rule 23(b) (eff. July 1, 2011) and, therefore, is "not precedential." Ill. S. Ct. R. 23(e)(1) (eff. July 1, 2011). Rule 23 further prohibits the citation of unpublished orders except in limited circumstances. *Id. Young* found the evidence was sufficient to convict defendant of leaving the scene of an accident where defendant attempted to flee on foot but was arrested within minutes and did not report the accident either before or after his arrest. We disagree with *Young*'s reasoning for the reasons stated above and note that *Young* did not address the admissibility of defendant's postarrest silence.

¶ 49        Since any evidence of Eubanks's postarrest silence is not admissible (*Nesbit*, 398 Ill. App. 3d at 212; *Simmons*, 293 Ill. App. 3d at 811; *Strong*, 215 Ill. App. 3d at 488), the State cannot establish that Eubanks failed to report the accident within half an hour. Accordingly, we reduce Eubanks's Class 1 felony conviction to the Class 4 version of the offense in the same statute, which requires that a driver in an accident causing injury or death stop at the scene and provide "reasonable assistance" as set forth in section 11-403. 625 ILCS 5/11-401(a), (c), 11-403 (West 2008).

¶ 50                        Constitutionality of Blood and Urine Tests

¶ 51        Following his arrest, Eubanks was subjected to warrantless, nonconsensual blood and urine tests pursuant to section 11-501.2(c)(2) of the Illinois Vehicle Code (625 ILCS 5/11-501.2(c)(2) (West 2008)), which mandates such tests whenever "a law enforcement officer has probable cause to believe that a motor vehicle driven by *** a person under the influence of

alcohol, other drug or drugs, or intoxicating compound or compounds, or any combination thereof has caused the death or personal injury to another." Eubanks argues that this section is unconstitutional, both on its face and as applied in his case. He therefore contends that he is entitled to a reversal of his conviction for aggravated driving under the influence and a new trial on the first degree murder charge. As we have already determined that Eubanks is entitled to a new trial on the first degree murder charge, we confine our analysis to the effect of the nonconsensual blood and urine tests on his conviction for aggravated driving under the influence.

¶ 52    The constitutionality of a statute is a question of law that we review *de novo*. *People v. Sharpe*, 216 Ill. 2d 481, 486-87 (2005). The party challenging the statute bears the burden of proving that it is unconstitutional. *People v. Aguilar*, 2013 IL 112116, ¶ 15. Moreover, a facial challenge to the constitutionality of a statute "must fail if any situation exists where the statute could be validly applied." *People v. Davis*, 2014 IL 115595, ¶ 25. While we would normally defer to the trial court's findings of fact and credibility determinations (*People v. Almond*, 2015 IL 113817, ¶¶ 55, 63) because the parties stipulated to the facts presented at the suppression hearing, we apply a *de novo* standard of review. *People v. Coats*, 269 Ill. App. 3d 1008, 1012 (1995) ("Inasmuch as the facts in this case [presented at suppression hearing] are stipulated, we will apply the *de novo* standard of review."). We may consider evidence presented at trial as well as at the suppression hearing. *Almond*, 2015 IL 113817, ¶ 55.

¶ 53    The fourth amendment of the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV; see *Schmerber v. California*, 384 U.S. 757, 770 (1966) (warrant requirement generally applies to searches within the human body, such as blood tests). Similarly, under article I, section 6, of the Illinois Constitution, "[t]he

people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches [and] seizures." Ill. Const. 1970, art. I, § 6. Under both of these constitutional provisions (see *People v. Caballes*, 221 Ill. 2d 282, 313-14 (2006) (article I, section 6, is interpreted in limited lockstep with the fourth amendment)), a warrantless search " 'is *per se* unreasonable unless it is a search conducted pursuant to consent, a search incident to arrest, or a search predicated upon probable cause where there are exigent circumstances which make it impractical to obtain a warrant.' " *People v. Ferral*, 397 Ill. App. 3d 697, 706 (2009) (quoting *People v. Alexander*, 272 Ill. App. 3d 698, 704 (1995)). The State bears the burden of showing the existence of exigent circumstances. *People v. Davis*, 398 Ill. App. 3d 940, 948 (2010); see also *People v. Foskey*, 136 Ill. 2d 66, 75 (1990) ("The circumstances must militate against delay and justify the officers' decision to proceed without a warrant.").

¶ 54    Eubanks does not dispute that the police had probable cause to believe that he was driving under the influence. Rather, he argues that there were no exigent circumstances that made it impractical to obtain a warrant. More specifically, he argues that (i) causing death or personal injury to another individual does not constitute a *per se* exigency and (ii) the State did not sustain its burden of showing exigent circumstances in his particular case.

¶ 55    The United States Supreme Court has considered whether exigent circumstances existed to justify a warrantless blood draw in both *Schmerber*, 384 U.S. 757, and *Missouri v. McNeely*, 569 U.S. 141 (2013). In *Schmerber*, the Court's answer was yes; in *McNeely*, the Court's answer was no. Because the parties rely heavily upon these cases, we discuss them in detail.

¶ 56    Schmerber was arrested at a hospital on suspicion of driving under the influence while receiving treatment for an accident in which both he and his passenger had suffered injuries. *Schmerber*, 384 U.S. at 758 & n.2. Over Schmerber's objection, an officer ordered a blood

sample taken from him without a warrant. The Supreme Court held that, under the circumstances, the warrantless blood draw was constitutional:

"The officer in the present case, however, might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence [citation]. We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest." (Internal quotation marks omitted.) *Id.* at 770-71.

¶ 57 After *Schmerber*, some courts, including our supreme court, held that the dissipation of blood alcohol or other substances from the bloodstream in DUI cases constitutes a *per se* exigency that justifies an exception to the warrant requirement. *People v. Jones*, 214 Ill. 2d 187, 196 (2005) (stating that "*Schmerber* made it 'clear that a compulsory blood test does not violate any constitutional rights of an individual' " (quoting *People v. Todd*, 59 Ill. 2d 534, 544 (1975))). But this interpretation of *Schmerber* was explicitly rejected by the Supreme Court in 2013 in *McNeely*, 569 U.S. 141. See *People v. Harrison*, 2016 IL App (5th) 150048, ¶¶ 21, 23 (recognizing that *Jones* was abrogated by *McNeely*).

¶ 58 McNeely was arrested for driving erratically. The arresting officer, without attempting to obtain a warrant, drove McNeely to the hospital and obtained a blood sample from him. In analyzing whether this was a constitutionally permissible search, the Court stated that,

"consistent with general Fourth Amendment principles, *** exigency in [the context of a DUI investigation] must be determined case by case based on the totality of the circumstances." *McNeely*, 569 U.S. at 145. The Court also clarified that "[i]n finding the warrantless blood test reasonable in *Schmerber*, we considered all of the facts and circumstances of the particular case and carefully based our holding on those specific facts." *Id.* at 151.

¶ 59   The State urged the Court to eschew the totality-of-the-circumstances approach in DUI cases and instead adopt a rule that exigent circumstances exist in all DUI cases because blood alcohol content evidence is "inherently evanescent." *Id.* The Court rejected any such categorical approach, stating:

> "It is true that as a result of the human body's natural metabolic processes, the alcohol level in a person's blood begins to dissipate once the alcohol is fully absorbed and continues to decline until the alcohol is eliminated. ***
>
> But it does not follow that we should depart from careful case-by-case assessment of exigency and adopt the categorical rule proposed by the State and its *amici*. In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so. [Citation.] We do not doubt that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test. That, however, is a reason to decide each case on its facts, as we did in *Schmerber*, not to accept the considerable overgeneralization that a *per se* rule would reflect. [Citation.]

*** Consider, for example, a situation in which the warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer. In such a circumstance, there would be no plausible justification for an exception to the warrant requirement." (Internal quotation marks omitted.) *Id.* at 152-54. The Court also noted that, in the years since *Schmerber*, technological advances have been developed that enable officers to obtain warrants more expeditiously. *Id.* at 154. Thus, the Court held that "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." *Id.* at 156. Since the arresting officer, in his testimony before the trial court, did not attempt to obtain a warrant and did not identify any factors that would have caused delay in securing a warrant, the Court affirmed the trial court's finding that no exigency existed. *Id.* at 163-65.

¶ 60        The State argues that *McNeely* is distinguishable because the Illinois blood-draw statute only mandates chemical testing when the driver has killed or injured another person, a factor not present in *McNeely*. In essence, the State proposes replacing the *per se* rule rejected in *McNeely* with another *per se* rule: exigent circumstances necessarily exist whenever there is probable cause to believe an individual has been driving under the influence of alcohol or other intoxicants *and*, in doing so, has injured or killed another individual. Eubanks, on the other hand, argues that *McNeely* rejected any such categorical approach.

¶ 61        *McNeely* is clear that courts should undertake a "careful case-by-case assessment of exigency" instead of "accept[ing] the considerable overgeneralization that a *per se* rule would reflect." (Internal quotation marks omitted.) *Id.* at 152-53; see also *Birchfield v. North Dakota*, 579 U.S. ___, ___, 136 S. Ct. 2160, 2174 (2016) (reaffirming *McNeely*'s holding that "the

exigent-circumstances exception must be applied on a case-by-case basis"). Other jurisdictions have interpreted *McNeely* as disapproving of all categorical or *per se* applications of the exigent-circumstances exception to the warrant requirement for compelled chemical testing. For instance, in *Aviles v. State*, 443 S.W.3d 291 (Tex. Ct. App. 2014), the Texas Court of Appeals struck down a statute that mandated a warrantless blood draw for any drunk-driving suspect who had been convicted of drunk driving on two or more prior occasions. The court explained that the statute "flies in the face of *McNeely*'s repeated mandate that courts must consider the *totality* of the circumstances of each case." (Emphasis in original.) *Id.* at 294. See also *Weems v. State*, 434 S.W.3d 655, 665 (Tex. Ct. App. 2014) (*McNeely* "clearly proscribed what it labeled categorical or *per se* rules for warrantless blood testing, emphasizing over and over again that the reasonableness of a search must be judged based on the totality of the circumstances presented in each case" (emphasis omitted) (citing *McNeely*, 569 U.S. at 151-56)); *State v. Stavish*, 868 N.W.2d 670, 680 (Minn. 2015) (the fact of a fatality in a drunk-driving case does not, by itself, create an exigency sufficient to justify a warrantless blood draw).

¶ 62        The State argues that the Fourth District "came to the opposite conclusion" in *People v. Hasselbring*, 2014 IL App (4th) 131128. We disagree with the State's reading of *Hasselbring* and also find the case inapposite because the defendant consented to chemical testing.

¶ 63        After Hasselbring collided with a fellow motorcyclist, an officer asked him to provide blood and urine samples for testing. Hasselbring consented. *Id.* ¶ 8. The samples tested positive for cocaine metabolite, and Hasselbring was convicted of aggravated driving with a drug, substance, or compound in his breath, blood, or urine. On appeal, Hasselbring argued that the Illinois implied consent statute (625 ILCS 5/11-501.6(a) (West 2010)) was unconstitutional under *McNeely*. That statute provides that a driver involved in an accident resulting in personal

injury or death, and issued a traffic ticket for that accident, is deemed to have given consent for a blood-alcohol test. *Hasselbring*, 2014 IL App (4th) 131128, ¶ 36.

¶ 64          In holding that the implied consent statute was constitutional, *Hasselbring* found that the statute did *not* create a *per se* exception to the fourth amendment's warrant requirement and, therefore, did not run afoul of *McNeely*. *Id.* ¶ 42. The court explained that, although consent is implied by default under section 5/11-501.6(a), a driver may choose to withdraw his consent and refuse an officer's request to provide a blood sample. *Id.* Hasselbring, on the other hand, chose to consent to the officer's request. Since consent is a well settled exception to the fourth amendment's warrant requirement, the chemical testing was constitutional. *Id.* (citing *People v. Pitman*, 211 Ill. 2d 502, 523 (2004)); *cf. Byars v. State*, 336 P.3d 939, 946 (Nev. 2014) (Nevada's implied consent statute, unlike the Illinois statute, did not allow a driver to withdraw consent; on this basis, the Nevada Supreme Court held that the "so-called consent cannot be considered voluntary" and the implied consent statute is unconstitutional under *McNeely*).

¶ 65          Contrary to the State's argument, *Hasselbring* does not stand for the proposition that a statute purporting to create a *per se* exigency is constitutional under *McNeely*. Moreover, *Hasselbring* is clearly distinguishable from the present case, where Eubanks never consented to chemical testing and, in fact, had to be physically restrained by security personnel before a blood sample could be taken and refused to give urine until the nurse ordered a catheter and approached Eubanks, still restrained, to insert it.

¶ 66          Therefore, we hold that, under *McNeely*, section 11-501.2(c)(2) is unconstitutional on its face, insofar as it permits compelled chemical testing without a warrant in all cases where an officer has probable cause to believe that a driver under the influence has caused death or personal injury to another. No doubt some such cases will involve exigencies, but when such

cases arise, the State can and should prove the existence of an exigency on a case-by-case basis rather than relying upon the " 'considerable overgeneralization' " (*McNeely*, 569 U.S. at 153 (quoting *Richards v. Wisconsin*, 520 U.S. 385, 393 (1997))) engendered by the current statute. See also *Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2183 ("the exception for exigent circumstances *** has always been understood to involve an evaluation of the particular facts of each case").

¶ 67    The facts of this case are illustrative since they do not reflect any exigency that would have prevented officers from obtaining a warrant. Eubanks was taken into custody at 9:05 p.m. Tanner gave a statement to police at around 10 p.m. in which he informed them that Eubanks was the driver in the fatal collision. At 12 a.m., Officer Ventrella spoke with Eubanks and informed him that he was under arrest for driving under the influence. Eubanks refused to take a breathalyzer test or submit blood and urine samples. Ventrella then "stood by and waited for instruction" from the major accident unit, which was directing the investigation. Nearly three hours passed before Ventrella brought Eubanks to the hospital at 2:57 a.m. Nothing in the record indicates that Ventrella or another officer could not have obtained a warrant in that three-hour period. The State invites us to speculate that obtaining a warrant could have been difficult due to the late hour, the time of year, and the severity of the collision. But there was no testimony to this effect at the suppression hearing or at trial—particularly since Ventrella, by his own admission, was waiting on standby. And it was the State's burden to show exigency, which, in the absence of any evidence that the State ever attempted to obtain a warrant, it failed to establish.

¶ 68    *Stavish*, 868 N.W.2d 670, cited by both parties in their briefs, is also illustrative because its facts contrast with the facts here. *Stavish* involved a single-vehicle rollover crash where the driver was seriously injured and his passenger was killed. The driver was brought to the hospital

for treatment, where an officer obtained a blood sample from him without a warrant. *Id.* at 673. Applying the *McNeely* totality-of-the-circumstances approach, the Minnesota Supreme Court held that the passenger's death did *not* constitute an exigency justifying a warrantless blood draw. *Id.* at 680. But other exigencies existed: the defendant's medical condition "rendered his future availability for a blood draw uncertain" because it was possible that he would need to be airlifted to another hospital, and even if he stayed at the same hospital, further medical care could preclude officers from obtaining a blood sample. *Id.* at 678. Under those facts, the court held that the warrantless blood draw was constitutionally permissible. *Id.* at 680.

¶ 69    By contrast, Eubanks was taken into custody minutes after the accident and placed in an interview room at 10:30 p.m., where he remained for the next 4½ hours. There was no concern that he might become unavailable before a warrant could be obtained, nor did the officers attempt to obtain one in that span of time.

¶ 70    The State next argues that, even if section 11-501.2(c)(2) is unconstitutional, admitting the results of Eubanks's blood and urine samples was proper where officers took the samples in good faith reliance on Illinois law. Eubanks's arrest occurred in 2009, four years before *McNeely* was decided. Thus, the State argues that the arresting officers were entitled to rely on our supreme court's 2005 decision in *Jones*, 214 Ill. 2d 187, which held that warrantless chemical testing of suspects was permissible. Eubanks argues that, even under *Jones*, collecting blood and urine samples from him would not have been allowed since he physically resisted their collection.

¶ 71    Evidence obtained in violation of fourth amendment principles is subject to suppression under the judicially created exclusionary rule. *Davis v. United States*, 564 U.S. 229, 236 (2011). But the good-faith exception permits the introduction of such evidence when officers acted with

an objectively reasonable good-faith belief that their conduct was lawful. *Id.* at 238. The relevant inquiry is " 'whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.' " *People v. LeFlore*, 2015 IL 116799, ¶ 25 (quoting *Herring v. United States*, 555 U.S. 135, 145 (2009)). In particular, "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Davis*, 564 U.S. at 241; see also *LeFlore*, 2015 IL 116799, ¶¶ 27-29 (adopting the reasoning of *Davis* in Illinois).

¶ 72    The State argues that the police could have reasonably relied on *Jones*, 214 Ill. 2d 187, as binding precedent authorizing the nonconsensual, warrantless taking of Eubanks's blood and urine. But *Jones* does not support the State's position. In *Jones*, the defendant verbally refused to give blood and urine samples but did not physically resist their collection. *Id.* at 190. Although *Jones* found that a nonconsensual blood draw was permitted by law, it also stated:

> "[O]ur holding in this case does not give law enforcement officers unbridled authority to order and conduct chemical tests. We do not suggest that a DUI arrestee's lack of a right to refuse chemical testing under section 11-501.2(c)(2) permits law enforcement officers to use physical force in obtaining blood, urine, and breath samples." *Id.* at 201.

Here, there is no question that physical force was used to obtain Eubanks's blood and urine samples. Eubanks was restrained by security officers and handcuffed to the hospital bed while blood was forcibly drawn from him. Similarly, with respect to the urine sample, it was only after the nurse approached Eubanks and threatened to catheterize him that he yielded and provided urine. The officers in this case could not have reasonably relied on *Jones* to authorize such conduct.

¶ 73        The State also argues that, at the time of Eubanks's arrest, other jurisdictions permitted officers to use reasonable force to obtain a blood draw when the officer had probable cause to believe that a driver was under the influence. See, *e.g.*, *State v. Worthington*, 65 P.3d 211, 214-15 (Idaho Ct. App. 2002). This is irrelevant, since a reasonably well-trained Illinois officer would have been aware that such actions were not authorized in Illinois under *Jones*.

¶ 74        Accordingly, the good-faith exception does not apply, and the results of Eubanks's blood and urine samples must be suppressed. On remand, Eubanks's new trial on the first-degree murder charge should exclude this evidence. Eubanks also argues, and the State does not contest, that his conviction for aggravated driving under the influence must be reversed outright, since there is insufficient evidence to prove the offense without the suppressed evidence. See *People v. Abdur-Rahim*, 2014 IL App (3d) 130558, ¶ 33 ("Because the State will be unable to prevail without the recovered evidence, we reverse defendant's conviction outright."). Thus, we reverse Eubanks's conviction for aggravated driving under the influence.

¶ 75                                    CONCLUSION

¶ 76        We find that the trial court erred in refusing to instruct the jury on the lesser included offense of reckless homicide since a rational jury could have found that Eubanks acted recklessly in causing Maria's death. We also find that the State could not establish that Eubanks failed to report the accident within half an hour without impermissibly introducing evidence of his postarrest silence. Finally, we hold that section 11-501.2(c)(2) of the Illinois Vehicle Code (625 ILCS 5/11-501.2(c)(2) (West 2008)) is unconstitutional on its face, insofar as it sets forth a categorical exception to the fourth amendment's warrant requirement of the kind rejected by the Supreme Court in *McNeely*, 569 U.S. 141.

¶ 77        We therefore reverse Eubanks's conviction for first degree murder and remand for a new trial. We also reduce his conviction for Class 1 failure to report an accident to the Class 4 version of the offense in the same statute (625 ILCS 5/11-401(a), (c) (West 2008)). Finally, we reverse Eubanks's conviction for aggravated driving under the influence. Because of our resolution of these issues, we need not reach Eubanks's remaining contentions of trial error.

¶ 78        Reversed and remanded.

¶ 79        JUSTICE PUCINSKI, dissenting.

¶ 80    I. You Should Not Be Able to Get a Reckless Homicide Instruction for "Some Other Dude"

¶ 81        A "SODDIT," *i.e.*, "Some Other Dude Did It" defense, in my opinion, precludes a reckless homicide instruction. I do not see how you can get a reckless homicide instruction for some other unnamed person.

¶ 82        This defendant denied all along that he was in the car, that he was driving it, or that he was even at the scene of the accident. Therefore, I would affirm the trial court's decision to deny any reckless homicide instruction.

¶ 83        The defendant represented himself and did not propose any specific reckless homicide instruction, just argued to the court that one should be given. The State objected. The court denied his request.

¶ 84        The majority agrees with the defendant that the reckless homicide instruction should have been given. I disagree.

¶ 85        There are three Illinois Pattern Jury Instructions to which defendant could possibly have been referring: Illinois Pattern Jury Instruction, Criminal, No. 5.01 (approved Dec. 8, 2011) (hereinafter, IPI Criminal No. 5.01), Illinois Pattern Jury Instruction, Criminal, No. 7.09 (approved Dec. 8, 2011) (hereinafter, IPI Criminal No. 7.09), and Illinois Pattern Jury

Instruction, Criminal, No. 7.10 (hereinafter, IPI Criminal No. 7.10). IPI Criminal No. 5.01, titled

"Recklessness-Wantonness," states:

"A person [(is reckless) (acts recklessly)] when he consciously disregards a

substantial and unjustifiable risk that circumstances exist or that a result will follow, and

such disregard constitutes a gross deviation from the standard of care which a reasonable

person would exercise in the situation."

IPI Criminal No. 7.09, titled "Definition of Reckless Homicide," states:

"A person commits the offense of reckless homicide when he unintentionally causes

the death of an individual [without lawful justification] by [(driving a motor vehicle) ***]

recklessly and in a manner likely to cause death or great bodily harm."

IPI Criminal No. 7.10, titled "Issues in Reckless Homicide," states:

"To sustain the charge of reckless homicide, the State must prove the following

propositions:

*First Proposition:* That the defendant caused the death of _____ [without lawful

justification] by [(driving a motor vehicle) ***]; and

*Second Proposition:* That the defendant [(drove a motor vehicle) ***] recklessly; and

*Third Proposition:* That the defendant [(drove a motor vehicle) ***] in a manner

likely to cause death or great bodily harm.

If you find from your consideration of all the evidence that each one of these

propositions has been proved beyond a reasonable double, you should find the defendant

guilty.

> If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 86      Each of these instructions involves the act of a person and the result of that act. In each of these instructions the jury is told, in essence, the defendant did it, but it was a reckless act, not intentional.

¶ 87      The majority relies on several cases. In *People v. Belk*, 203 Ill. 2d, 187 (2003), the defendant, a 16-year-old, stole a van and was actually being pursued at high speed by the police. He did not deny he was the driver of the van but asked for a reckless homicide instruction. He was convicted of felony murder based on a theory that aggravated possession of a motor vehicle is a forcible felony for felony murder purposes. The appellate court reversed, saying that aggravated possession could not be a forcible felony and his conviction was reduced to reckless homicide.

¶ 88      In *People v. Pollard*, 2015 IL App (3d) 130467, the defendant admitted the actions and inactions that led to her baby's death but not the *mens rea.*

¶ 89      In *People v. Jones*, 404 Ill. App. 3d 734 (2010), the defendant admitted fighting with the victim but claimed the victim's death was the result of the defendant's reckless action and not intentional.

¶ 90      In *People v. Stevens*, 324 Ill. App. 3d 1084 (2001), the defendant admitted driving the car but said his actions leading to the death of the victim were reckless not intentional.

¶ 91      In *People v. Thomas*, 266 Ill. App. 3d 914 (1994), the defendant admitted driving the car but said he could not see the victims' car because of a hill in the way.

¶ 92    In *People v. Alsup*, 373 Ill. App. 3d 745 (2007), the defendant admitted driving the car and being responsible for the wreck that led to the death of the victim but that his behavior was reckless not intentional.

¶ 93    In *People v. Gittings*, 136 Ill. App. 3d 655 (1985), the defendant admitted driving the car that led to the death of a victim. He was charged with reckless homicide and convicted of reckless homicide. He was appealing his one year sentence.

¶ 94    In *People v. DiVincenzo*, 183 Ill. 2d 239 (1998), the defendant admitted interacting with the victim but denied killing him.

¶ 95    In all of these cases, the defendants admitted the actions that led to the death of their victims. They admitted they did it but said it was not intentional; it was reckless or provoked or self-defense.

¶ 96    In *People v. Washington*, 375 Ill App. 3d 243 (2007), the defendant admitted being at the scene of the robbery and being with the victim but his version of events differed from the victim's.

¶ 97    *People v. McDonald*, 2016 IL 118882, was slightly different. In his first trial the defendant was convicted of first degree murder and appealed. The appellate court reversed and remanded because of an erroneous jury instruction. The defendant did not testify. In his second trial the defendant was again convicted of first degree murder. He appealed, claiming that the trial judge erred in refusing to give the jury instructions on involuntary manslaughter and second degree murder due to serious provocation. The defendant maintained there was some evidence at trial that he acted recklessly in stabbing the victim, that is, the defendant argued that although he did the act it was reckless not intentional behavior. In his request for the jury instruction, he argued that there was enough evidence at trial that he acted recklessly.

¶ 98    Unlike Eubanks, who never admitted he drove the car, hit anyone with the car, or was anywhere near the car, the defendant in *McDonald* did not argue that he was not the one who stabbed the victim. He argued for two lesser included instructions that would clearly put him at the scene of the stabbing and clearly put him in action in the stabbing but without the mindset needed to prove first degree murder.

¶ 99    The appellate court affirmed. The supreme court held that the appropriate standard of review is abuse of discretion, reviewed the case under plain error, and affirmed, finding that "the appropriate standard for determining whether a defendant is entitled to a jury instruction on a lesser-included offense is whether there is some evidence in the record that, if believed by the jury, will reduce the crime charged to a lesser offense, not whether there is some credible evidence." (Emphasis omitted.) *McDonald*, 2016 IL 118882, ¶ 25.

¶ 100    Using that standard, the supreme court found that there was a "dearth" of evidence to support the defendant's involuntary manslaughter instruction. *McDonald*, 2016 IL 118882, ¶ 57. And the supreme court found that there was insufficient evidence to justify the requested jury instruction on second degree murder by serious provocation. *McDonald*, 2016 IL 118882, ¶ 67.

¶ 101    In *People v. Martin*, 236 Ill. App. 3d 112 (1992), the defendant testified he was not at the scene of the death of the victim, did not do it, had an alibi, and that his statements to the police were beaten out of him. The victim died of blunt force trauma to the head and multiple stab wounds. At the jury instruction conference, the defendant requested instruction as to a "lesser included crime" but did not tender any specific instruction. When pushed by the trial judge, the defense suggested an involuntary battery instruction, which the trial court denied because the lesser included offense instructions were inconsistent with the defendant's alibi defense:

" 'THE COURT: What lesser included?

MR. VICTOR: Whatever they [the jury] can find.

THE COURT: Well, what do you want? Don't tell me whatever they can find, they can charge him for battery I guess.

MR. VICTOR: Battery. Involuntary.

THE COURT: Where is there evidence of that in there? There isn't any evidence. He says he wasn't there, he didn't do it. How could the jury possibly find a lesser included verdict under those circumstances? If he said he was there and had a fight with him that is one thing, but he says he is not there. Why do you instruct them on a lesser included theory?

MR. VICTOR: Okay, okay. I will buy that, I will withdraw it.' " *Martin*, 236 Ill. App. 3d at 118.

The defense did not object. After a jury trial, the defendant was found guilty of first degree murder. Defendant appealed, in part arguing that the trial court erred in not giving the lesser-included offense instructions.

¶ 102    Our colleagues in the First District sidestepped the question of whether an alibi defense precludes a lesser-included offense by finding that that issue was waived but went on that even if it were analyzed under plain error, the decision of the trial court would still not "save" the defendant because the evidence was not closely balanced (*Martin*, 236 Ill. App. 3d at 119) and the evidence was more than sufficient to support defendant's conviction for first degree murder. (*Martin*, 236 Ill. App. 3d at 120).

¶ 103    In its discussion of defendant's ineffective assistance of counsel claim, our colleagues seem to be troubled by the very inconsistency that exists in the case before us: that denying you committed the crime is inconsistent with a lesser-included offense instruction:

"In the instant case, defendant's testimony was that he did not commit the crime. The principal contested issue at trial was his guilt or innocence, not whether he reasonably or unreasonably acted in self-defense. At no time during trial did defendant pursue the defense of second-degree murder or present any evidence to support self-defense. In fact the evidence that defendant argues supports a second-degree murder instruction was his own statement to the police which at trial he denied was true. Therefore, we cannot say that the possible tactical decision not to give a lesser-offense instruction on second degree murder was ineffective assistance." *Martin*, 236 Ill. App. 3d at 125.

¶ 104    Finally, the majority relies on *People v. Patel*, 366 Ill. App. 3d 255 (2006). Patel was charged with solicitation of murder for hire. He said he did not do it, that he at most was soliciting aggravated battery, and requested that instruction, which the court denied. His wife, the intended victim, fortunately suffered no harm as a result of his machinations. He did not deny that he did something. He just said it was not solicitation for murder for hire. He was convicted of solicitation to murder for hire. He appealed based on the judge's refusal of the lesser included instruction. The appellate court affirmed, holding that the defendant waived the argument but went on to conclude that even if they considered it under plain error: "A defendant is entitled to a lesser included offense instruction only if the evidence would permit a jury rationally to find the defendant guilty of the lesser included offense and acquit him or her of the greater offense." (Internal quotation marks omitted.) *Patel*, 366 Ill. App. 3d at 276. The court found that the evidence was not closely balanced and any failure to give the lesser included instruction was not prejudicial. *Patel*, 366 Ill. App. 3d at 276-77.

¶ 105     Here, the defendant denies he was in the car, drove the car, or was even there. The defendant was trying to elude the police, who were not giving chase at all, let alone a high speed chase.

¶ 106     The defense in oral argument argued that, because the State offered evidence that the defendant was the driver, he should be entitled to a reckless homicide instruction. But that allows the defendant to have it both ways: "I didn't do it. I wasn't even in the car. I wasn't even there. But, if you the jury, believe I was in the car even though I am telling you I wasn't, then the death of Maria wasn't intentional it was because I was being reckless." I do not believe this is logical or even supportable. I note that even after all of the evidence was presented in this case the defendant continued to argue, particularly during the jury instruction discussion with the judge, that he did not do it, was not in the car and was not the driver. His continued denials that he performed *any* act that lead to Maria's death make him, in my opinion, ineligible, for the reckless (act) instruction.

¶ 107     I do not believe the defendant should be able to get a reckless homicide instruction for the act of some unnamed other person.

¶ 108              II. The State Failed to Prove He Did Not Report an Accident

¶ 109     The majority undertakes a self-incrimination analysis of this charge. The defendant did not frame a self-incrimination argument, and I do not believe we can make one for him.

¶ 110     Instead the defendant argues in this regard that the State did not *prove* that he failed to make a timely report.

¶ 111     This is a circular argument since the defendant all along, and at every possible opportunity, has claimed he was not even in the car, let alone driving it, at the time of the accident. The accident occurred about 8:58 p.m. on the night in question. The defendant was

apprehended a short distance from the accident scene at 9:05 p.m. and placed under arrest. Not only did he not report the accident at any time—let alone within one-half hour—he kept denying he was in the car, drove the car, or was anywhere near the accident. He continued this line of defense throughout the trial. It was perfectly within the jury's province to determine that he could not possibly have reported the accident since he kept denying he was even there.

¶ 112    Further, the self-incrimination argument will not work because that question has been determined by two cases and the majority is not taking issue with them: *People v. Brady*, 369 Ill. App. 3d 836 (2007), and *People v. Young*, 2012 IL App (1st) 092124-U. We are not required to rely on the opinion of another appellate court district, but if we do not agree with it, we should at least say why. And, of course, even we cannot cite a Rule 23 order of our own court, but we can point to a persuasive analysis as informing our own.

¶ 113    In *Brady*, the defendant was drag racing with another young man at high speeds resulting in the other man's death. Brady was charged with several counts, among them failure to report the accident within the time required. The accident occurred on February 25, 2003, and Brady was arrested on February 28, 2003. At no time did he report the accident or that he was involved. Brady challenged the statute as an unconstitutional requirement for self-incrimination. The court reasoned that a "person who admits involvement in an accident does not also admit that he or she caused the accident. Accordingly, defendant's compliance with section 11-401(b), resulting in an implied admission of involvement in the motor vehicle accident, would not have amounted to a real danger of self-incrimination or provided the State with a link in the chain of evidence needed to prosecute him for the separate offence of aggravated reckless driving." *Brady*, 369 Ill. App. 3d at 852.

¶ 114    *Young* is closer to the facts in this case because Young was in custody shortly after an accident in which he was involved led to the death of another. In *Young*, our colleagues reached the same conclusion about the reporting requirement as in *Brady*. In *Young*, the defendant denied all along that he was the driver of the car involved in a fatal accident. The accident occurred on January 17, 2007, and the defendant was arrested by an officer who saw him get out of his car and leave the scene. The officer followed him and arrested him shortly after the accident. At no time did the defendant report the accident or his involvement. Our colleagues wrote, "Simply identifying himself as a driver involved in a fatal accident, as required by the statute, would not have been a 'link in the chain of evidence needed to convict' him of a separate offense, where mere driving and identity did not form the basis of any criminal charges in the case." *Young*, 2012 IL App (1st) 092124-U, ¶ 52.

¶ 115    If Young and Brady were not subject to mandatory self-incrimination under the reporting requirement then I do not think defendant was either.

¶ 116                    III. Unconstitutionality of Warrantless Blood and Urine Draw

¶ 117    The defendant argues, and the majority agrees, that section 11-501.2(c)(2) is unconstitutional because it permits warrantless, nonconsensual blood and urine draws from persons arrested in connection with a motor vehicle accident that resulted in the death of another person.

¶ 118    They rely on *Missouri v. McNeely*, 569 U.S. 141 (2013).

¶ 119    Maybe this is the right case to determine that the statute is unconstitutional. But I do not think we need to go that far. Further, I think everyone is overlooking a very simple fact: driving a car and getting a driver's license to do it is a privilege, not a right, and the legislature is perfectly within its reasonable authority to determine what rules will apply. Maybe it would be better if the

legislation prohibited use of unnecessary force to obtain the fluid samples or if it defined exigent circumstances or if it required everyone who applies for a driver's license or renews one in Illinois to sign a pre-consent to fluid samples in the event of any accident resulting in death or great bodily harm, but those are issues for the legislature.

¶ 120     I believe the record, briefs, and oral argument amply demonstrated that the police had sufficient opportunity to obtain a warrant. There are about 400 judges in Cook County. The State's Attorney's felony review unit operates 24 hours per day, seven days per week. It is simply not credible that the police could not find some way to find a judge to hear the question of the warrant between 9:05 p.m. when defendant was arrested and 4:10 a.m. when the blood was drawn with force and 5:20 a.m. when the urine sample was collected under pressure. For that reason, and that reason alone, I would grant the defendant's argument that the blood and urine draws were inadmissible.

¶ 121     I believe we can rule out the use of the fluid samples because we do not believe there were exigent circumstances. I do not, however, believe we are required to find the statute unconstitutional.

¶ 122     If you take the blood and urine out of the equation, that still does not solve the defendant's larger problem because then it would be reasonable for any trier of fact to determine that the defendant was unimpaired and making specific choices when he decided to drive at 60 to 80 miles per hour down a narrow residential street at 8:58 p.m. and fatally struck Maria and permanently disabled her son, Jeremiah. Maria would be just as dead and Jeremiah just as disabled if the defendant had randomly shot a gun and hit them. The car was his lethal weapon. He got behind the wheel of a car and started it on purpose. He drove it on purpose. He drove down that street on purpose. He sped down that street on purpose.

¶ 123       If his decision was not impaired, it was with knowledge. He knew he was driving too fast; his passenger told him. He knew it was a narrow residential street; he could see it.

¶ 124       For these reasons I believe the judge's denial of the defendant's lesser included offense instruction was correct and that defendant's convictions for first degree murder and failure to report an accident must be affirmed.