2020 IL App (1st) 152319-U-B

SIXTH DIVISION
MARCH 27, 2020

No. 1-15-2319

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 10642 |
| | ) | |
| JOSHUA ENRIQUEZ, | ) | Honorable |
| | ) | Neera Walsh and |
| Defendant-Appellant. | ) | Joseph M. Claps, |
| | ) | Judges Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Justices Connors and Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*: Following the supreme court's decision in *People v. Eubanks*, 2019 IL 123525, the defendant-appellant's first degree murder conviction is affirmed over his challenge to the trial court's refusal to give a reckless homicide instruction.

¶ 2    This case returns to us following a supervisory order from the supreme court directing us to vacate our judgment in *People v. Enriquez*, 2018 IL App (1st) 152319-U, and reconsider, in light of *People v. Eubanks*, 2019 IL 123525, whether the trial court abused its discretion in

declining to instruct the jury on the offense of reckless homicide. For the reasons that follow, we again affirm defendant-appellant Joshua Enriquez's convictions.

¶ 3                                    BACKGROUND

¶ 4      On the morning of May 3, 2009, the defendant's Jeep Cherokee SUV (the SUV) struck a car containing four people: Gabriella Almanza, Nicole Mijares, Maria Ortega, and Karina Paredes, the defendant's ex-girlfriend.  Almanza and Mijares were killed in the incident, and Ortega and Paredes were injured.

¶ 5      The defendant was charged with multiple counts of murder, attempted first degree murder, and aggravated battery.  The State proceeded to trial only on the murder and aggravated battery counts. We set forth the facts in detail in our previous order and repeat only those necessary to resolve the current issue on appeal.

¶ 6      At a jury trial, the State called several witnesses to the May 3 crash.  Shema Harris, a CTA bus operator, testified that in the early morning hours of May 3, 2009, she was driving home on Kedzie Avenue following the end of her shift when she saw a "little dark car" behind her, and an SUV behind the car.  She recalled the SUV was "speeding" and "zigzagging across the road," "going from lane to lane."   Harris "looked back in the mirror, and I saw the truck hit the car, and the car flipped and rammed up into the park."  She saw that the SUV "flipped over."

¶ 7      Brittany Berman and Megan Lorang also witnessed the aftermath of the crash.  Lorang lived at 1010 North Kedzie Avenue and Brittany was spending the night there on May 3.  Berman was asleep on the couch near a window when she was awakened by "an extremely loud, unbelievably long crash."  She went to the window and saw an SUV "on its roof, and it was rocking as if it had just landed."  She told her friend to call 911.  She then went onto the balcony and saw a man, whom she identified as the defendant, emerge from the driver's side of the SUV and stand

up. She asked him "if he was okay" but he did not respond at first. She saw him start to "pace a little bit." After she asked a second time if he was okay, the defendant responded "yeah." She asked the defendant if there was anyone else in the vehicle, and he said "no."

¶ 8     Berman looked across the street into the park and saw "the other car that had hit the tree." The car was "smoking" and "completely crushed." When she looked back toward the street, she no longer saw the defendant. She subsequently identified the defendant in a police lineup.

¶ 9     Lorang testified that she heard a loud crash and Berman screaming. After speaking to Berman, she went on the balcony and "saw an SUV turned over in front of the apartment" that was "completely upside down." Lorang "saw a man outside the SUV walking around," whom she identified as the defendant, as well as "several smashed cars along the road." Across the street, in the park, she saw "another car smashed against a tree." She recalled the defendant "looked a little disoriented" and was "walking around the car."

¶ 10    Chris Garcia, who lived at 1138 North Kedzie, testified that he woke up at approximately 5:45 a.m. on the date of the incident to let his dog outside. As he was standing in his hallway, he saw two vehicles pass, a small car and an SUV. The vehicles were close, "bumper to fender." He recalled that he "saw two vehicles together. I saw smoke and it smelled like rubber." After the vehicles passed, he heard a crash.

¶ 11    Detective Wayne Rashke testified that he investigated the scene of the collision on the morning of May 3, 2009. He described the relative positions of the vehicles at the scene, as well as skid marks. Detective Rashke confirmed that the People's Exhibits 17 through 44 were photographs taken of the scene. He described the photographs, which showed that the defendant's SUV was on its roof and that the smaller car, a black Pontiac, had traveled into the park and struck

two trees. The passenger's side of the car was severely damaged, and the vehicle's airbags had deployed.

¶ 12    The State then called Maria Ortega, one of the victims of the crash. Ortega testified that in the early morning of May 3, 2009, she drove her sister, Gabriella Almanza, and their friends, Nicole Mijares and Karina Paredes toward the Humboldt Park area. Ortega's car was a Pontiac Grand Am. The four friends stopped at a Citgo gas station on the corner of Kedzie Avenue and North Avenue and Ortega exited the car to make a purchase in the gas station. Upon exiting, she noticed the defendant's truck pull into the station. Ortega stated that she knew the defendant "from the neighborhood that we grew up on" and knew that he was Paredes' ex-boyfriend. Ortega saw that the defendant's current girlfriend was with him, in the passenger's seat of the defendant's vehicle.

¶ 13    Ortega testified that, after she left the gas station, she and her friends drove to another location, where she purchased marijuana. A short time later, Ortega was driving north on Albany Avenue, a one-way street, when she saw the defendant's vehicle "double-parked" in the street, and the defendant was standing next to his SUV. She saw the defendant's girlfriend "on the sidewalk." Ortega testified that she "slowed down and I drove around" the defendant and his vehicle. She then looked in her rearview mirror and saw the defendant get into his vehicle. Ortega turned west onto Bloomingdale Avenue, and then turned south onto Kedzie. The defendant followed her.

¶ 14    As her car approached the intersection of Kedzie and North Avenue, her car was hit from behind by the defendant's SUV; Ortega recalled there was "a hard impact and we jolted a bit forward." As Ortega continued to drive south on Kedzie, the defendant's SUV "came again and it pushed my car through the red light on North Avenue." Ortega noticed "some rattling in the back" of her car. She recalled that she was "trying to accelerate" but her car did not respond. She

testified that the defendant "kept hitting my car" from behind. Asked how many times, she answered "more than four."

¶ 15    Ortega recalled that her "car started to smoke and I started to think before I would hit another intersection light that I would try to get away from him." She testified that she "turned [the] steering wheel to the left to try to turn in the park entrance." Ortega's next memory was waking up in the hospital. Describing her injuries, Ortega testified she had "50-something stitches on the left side of my face," received a cast on her twisted left ankle, and had surgery on her right foot.

¶ 16    The State also called Paredes, the defendant's ex-girlfriend, to testify. Paredes testified that she began dating the defendant in the summer of 2007 and he was jealous and controlling. At different times during their relationship, the defendant shot her, stabbed her, and choked her. She eventually ended the relationship in late 2008.

¶ 17    Paredes testified that she was in the car with Ortega, Almanza, and Mijares on May 3. Paredes saw the defendant drive into the gas station while Ortega was making a purchase. The defendant's new girlfriend was in the passenger's seat. Paredes recalled that the defendant "looked into [Ortega's] car" after which he "kept driving" and left the gas station.

¶ 18    As Ortega drove on Albany Avenue back to her house, Paredes saw the defendant "in the middle of the street." Paredes testified that Ortega drove around the defendant without speaking to him. After Ortega's car passed, Paredes looked back and saw the defendant getting into his vehicle. She recalled that "when I looked back again *** he is already speeding up so that I told [Ortega] to drive faster." Paredes recalled that, as Ortega was driving on Kedzie Avenue, the defendant's "truck hit our rear end." She testified that "the impact was hard" and Ortega's car "started smoking." Paredes stated that "it sounded like the wheel was going to come off."

¶ 19 Paredes testified that the defendant "kept hitting us from the back," striking Ortega's car "over five times." Asked about the last time Ortega's car was hit, Paredes said "I just remember bracing myself and that was it." The next thing she remembered was waking up at the hospital. Paredes suffered a fractured pelvis, wrist and arm.

¶ 20 On cross-examination, Paredes acknowledged that after the defendant shot her, she told the hospital that she was shot in a drive-by shooting. She admitted that she did not make a police report for either the stabbing or choking incident. Paredes also acknowledged that she had an argument with the defendant's new girlfriend "a couple weeks before" the May 3, 2009 collision.

¶ 21 The State introduced evidence that following the collision, the defendant reported his car stolen while giving a fake name to the police. The defendant was finally apprehended on May 8, 2009, hiding in a closet of a residence.

¶ 22 After the State rested, the defendant testified. He acknowledged that he and Paredes began dating in the spring of 2007. He testified that their relationship was "kind of rocky" because he "did a lot of cheating," which upset Paredes. However, the defendant denied that he ever hit, shot, or stabbed Paredes.

¶ 23 As of May 3, 2009, the defendant had another girlfriend, Monique. According to the defendant, Paredes was not happy about his relationship with Monique. He testified that he "was still messing around with" Paredes after he began dating Monique. He stated that he had sex with Paredes in December 2008, and "around January" Paredes told him that she was pregnant. The defendant stated that Paredes did not have the baby. Asked if he tried to "work things out" with Paredes after she became pregnant, the defendant said that he told Paredes that it was not a "good idea for us to get back together" because of his relationship with Monique. The defendant testified that Paredes "kind of got mad at the fact that I didn't want to get back with her."

¶ 24    The defendant recalled that, on the evening of May 2, 2009, he was with Monique and several of her friends drinking alcohol.   Asked how much he drank, the defendant said he "lost count at like the second fifth" of alcohol.  The group began at a bar, and then continued drinking in a park.  After leaving the park, they "rode around most of the night, talking."

¶ 25    In the early hours of May 3, 2009, the defendant drove to the Citgo gas station "[t]o get Monique something to drink."  He did not go into the store, however, because he saw Paredes and Ortega.  He stated that he "knew there was going to be problems" if he went into the store, and was concerned about "Monique and the girls having a fight."   The defendant testified that "[a]s soon as I pulled in, I pulled right back out" of the gas station.

¶ 26    He then drove to Albany Avenue, where Monique's car was parked.  There, he exited his vehicle to retrieve a "hoodie" that he had left in her car.  He "start[ed] having a conversation with Monique."  As they talked, he noticed that Monique looked "pas[t] my shoulder," after which he turned and saw Ortega's car approaching.  He stated: "As I was trying to get into my car, [Ortega] hit me on the side of my -- well on the back of my body."  Asked to clarify, he said that Ortega "passed by me and hit me" with her car.

¶ 27    The defendant then "jumped in [his] car and tried to follow them."  He did so "[b]ecause I wanted to know why she hit me," as he felt "upset and confused" that she had struck him.  He followed Ortega's car when it turned onto Bloomingdale Avenue.  He recalled that, as he made the turn, "I took my eyes off the road for a split second to pick up my phone on the floor" and "[b]y the time I looked up, I hit her on the back of the car."

¶ 28    He then recalled that Ortega "pushed on the gas and turned [south] on Kedzie, so I just continued to follow her."  He recalled that "[s]moke was coming from the back of her car" and he "continued to chase her to try to stop her."  He maintained that he did so "because I wanted to

know why she hit me." The defendant admitted that he "bumped her again" near the intersection of Kedzie and Wabansia Avenue. When his counsel asked why, he answered "I don't know." He then stated "I remember bumping her again" near the intersection of Kedzie and North Avenue.

¶ 29    The defendant further testified that "I switched to the opposite lane trying to get her attention." He stated that he tried to beep his horn "but my horn wasn't working." He "was trying to get on the side of her" but "[s]he kept on speeding up." He acknowledged that he was "going the wrong way" when he switched lanes. He "continued trying to chase her" down Kedzie Avenue, recalling that "she kept on switching lanes" and "wouldn't let me get on the side of her."

¶ 30    He stated that he was "trying to get her attention to pull over" when he "noticed that cars [were] coming down Division [Street.]" At that point he "let go of the gas and tried to pump my leg on the brake to slow down." He saw Ortega go through a red light, and he "[s]tepped on the gas to try to catch up back to her." He again "came up on the side of her" and Ortega's car "jumped in front of me." He testified: "I think she was trying to get into the little side street right there to the park." The defendant stated that he "tried to jump out her way to get into the next lane, but by that time it was already too late." His vehicle "came in contact with the car" and he "flipp[ed] in the air."

¶ 31    The defendant "woke up hanging upside down" in his vehicle. He crawled out of his vehicle and felt "dazed." He stated that he did not see Ortega's car. At the conclusion of his direct examination, his counsel asked: "Did you mean to hurt, kill those girls?" The defendant answered: "No."

¶ 32    On cross-examination, the prosecutor asked: "You didn't have any trouble controlling that car from all this drinking that you were doing, did you?" He answered: "No, sir."

¶ 33    The defendant acknowledged that he did not ask for help for the women in Ortega's car.

He testified that he "thought they got away" and did not see their car after the collision. When the prosecutor asked why he left the scene, the defendant answered: "I just finished hitting those parked cars. I was drunk. I didn't have no license. Just a quick reaction I guess."

¶ 34 When asked "how many times did you strike the back of that vehicle," he testified: "I'd say I strike once, bump about two, three" times. He maintained that he did so "to get her attention" to "pull over" to talk to him. He stated that, at one point he "made eye contact" with Almanza and her "body language was telling me she is reaching over to Maria [Ortega] and *** telling her to pull over." The defendant admitted that he pursued Ortega's car for over a mile before the collision.

¶ 35 During closing argument, the State urged that the evidence, including the defendant's prior acts of violence against Paredes, showed that the defendant acted purposefully in causing the fatal collision. Defense counsel argued to the jury that the defendant was intoxicated and "wasn't thinking clearly" at the time of the incident, but that he had no intent to hurt or kill anyone when he "bumped" Ortega's car.

¶ 36 The jury found the defendant guilty of two counts of first degree murder and two counts of aggravated battery. The trial court entered judgment on the verdicts.

¶ 37 The trial court denied the defendant's posttrial motion and his motion to reconsider. The court ultimately sentenced the defendant to natural life imprisonment for the first degree murder convictions and concurrent 10-year extended-term sentences for the aggravated battery convictions.

¶ 38 The defendant timely appealed on July 14, 2015. On appeal, he contended that he was entitled to a new trial because (1) the trial court declined to instruct the jury on the lesser offense of reckless homicide; (2) the trial court declined his request for *voir dire* questions on the subject

of domestic violence; and (3) he was prejudiced by prosecutorial misconduct.

¶ 39     In our order of June 8, 2018, we rejected the defendant's claims of error and affirmed his convictions. *People v. Enriquez*, 2018 IL App (1st) 152319-U. The defendant appealed to the supreme court, which issued a supervisory order dated March 4, 2020. The court directed us to reconsider our judgment in light of *People v. Eubanks*, 2019 IL 123525, which had been decided in the interim and in which the court considered whether the trial court had abused its discretion in denying a jury instruction for reckless homicide following a traffic accident.

¶ 40                                        ANALYSIS

¶ 41     The principles of law that govern the giving of a lesser-included offense instruction remain the same post-*Eubanks*, and we repeat them here. Specifically, the "appropriate standard of determining whether a defendant is entitled to a jury instruction on a lesser-included offense is whether there is *some evidence* in the record that, if believed by the jury, will reduce the crime charged to a lesser offense, not whether there is *some credible* evidence." (Emphases in original.) *People v. McDonald*, 2016 IL 118882, ¶ 25. We review the trial court's decision for an abuse of discretion. *Id.* ¶ 59; see also *Eubanks*, 2019 IL 123525, ¶ 72.

¶ 42     The primary distinction between first degree murder and the lesser-included offense of reckless homicide is the mental state of the defendant. *Eubanks*, 2019 IL 123525, ¶ 74. The mental state required to support a conviction for murder is knowing that one's actions "create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(2) (West 2008)). The mental state for reckless homicide, on the other hand, is the reckless performance of actions that are likely to cause death or great bodily harm to another. 720 ILCS 5/9-3(a) (West 2008). A person acts recklessly when "he consciously disregards a substantial and unjustifiable risk *** and such disregard constitutes a gross deviation from the standard of care

which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2008). " 'Reckless conduct generally involves a lesser degree of risk than conduct that creates a strong probability of death or great bodily harm.' " *Eubanks*, 2019 IL 123525, ¶ 74 (quoting *People v. DiVincenzo*, 183 Ill. 2d 239, 250 (1998).

¶ 43　In *Eubanks*, the defendant was convicted of, *inter alia*, first degree murder, after fleeing a traffic stop and striking and killing one pedestrian and seriously injuring another. 2019 IL 123525, ¶ 1. The facts at trial revealed that the defendant, at approximately 9 p.m., was traveling anywhere between 50 to 90 miles per hour on a residential street without his headlights on when 2 pedestrians crossed the street between parked cars. *Id.* ¶¶ 12-15. The defendant struck the pedestrians without slowing down and drove away. *Id.* Earlier that evening, the defendant had fled a traffic stop. *Id.* ¶ 10. The defendant's urine tested positive for cannabis and ecstasy and their metabolites, as well as cocaine metabolite. *Id.* ¶ 21. The trial court denied the defendant's request for a reckless homicide instruction based on the rate of speed of his car and the severity of the impact to one of the pedestrians, who flipped head over heels in the air. *Id.* ¶¶ 13, 22.

¶ 44　On appeal, the defendant argued in relevant part that the trial court abused its discretion by failing to give the reckless homicide instruction, and this court agreed. *People v. Eubanks*, 2017 IL App (1st) 142837, ¶ 38. The supreme court affirmed this court's decision on this issue after granting the defendant's petition for leave to appeal. The court began by explaining that a defendant's mental state is ordinarily subject to proof by circumstantial evidence, and determining the mental state of a defendant was a task particularly suited to a jury. *Eubanks*, 2019 IL 123525, ¶ 74. The court went on to acknowledge the difficulty in deciding whether to give a reckless homicide instruction in a first degree murder case because "courts have typically focused on the same factors in finding the evidence sufficient to prove reckless homicide and knowing murder."

*Id.* ¶ 77. Ultimately, however, the court concluded that some evidence in this case supported a reckless homicide instruction, citing the fact that the accident occurred in a quiet neighborhood, at 9 p.m., in December. *Id.* ¶ 81. From this, the court explained, a jury could have inferred that the defendant's mental state was reckless as opposed to knowing. *Id.* Indeed, the court collected cases in which some juries had found similar circumstances to support a reckless homicide conviction, but others to support a conviction of first degree. *Id.* ¶¶ 78-81.

¶ 45    We find this case factually distinguishable from *Eubanks*. Unlike the defendant in Eubanks, who, while speeding through a residential neighborhood to evade police, did not necessarily see the pedestrians who appeared between parked cars, the defendant here *intentionally* followed and "bumped" Ortega's vehicle multiple times over one mile. Indeed, despite having a much larger car, he *continued* to pursue and hit Ortega's smaller car even after he noticed that the car was "smoking." The defendant made a series of choices that evince a knowing mental state, specifically, going the wrong way down the street in his pursuit of Ortega, accelerating to chase Ortega through a red light, and then driving alongside her car. No reasonable person could fail to see that such actions were substantially certain to cause serious bodily harm or death.[1]

¶ 46    The only evidence that the defendant points to in support of a reckless homicide instruction was his own self-serving testimony that he did not want to kill anyone and only wanted to get Ortega's attention. But his actions wholly belie this contention. In light of the ample, if not overwhelming, evidence that the defendant acted knowingly or intentionally, the defendant's lone self-serving statement did not justify giving a reckless homicide instruction. Therefore, we cannot

---

[1] Moreover, his actions following the incident are also consistent with a finding of the defendant's knowing or intentional mental state. He left the scene of the fatal collision, called 911 to falsely report that his vehicle was stolen, and evaded police for several days.

say that the trial court abused its discretion when it determined that there was insufficient evidence to support a reckless homicide instruction.

¶ 47     With regard to the remaining errors which the defendant raised on appeal – *i.e.* the trial court's refusal to allow *voir dire* questions on the subject of domestic violence and prosecutorial misconduct – our analysis from our prior order remains unchanged and is incorporated by reference herein.  See *Enriquez*, 2018 IL App (1st) 152319-U, ¶¶ 69-97.

¶ 48     The parties' briefs adequately lay out their respective contentions and we are therefore of the opinion that oral argument is unnecessary in this case.  We thus order that, pursuant to Supreme Court Rule 352(a) as amended, this case is taken for consideration without oral argument.

¶ 49                                  CONCLUSION

¶ 50     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 51     Affirmed.